**HOGAN TRANSFER AND STORAGE CORPORATION, and Aero Mayflower Transit Company, Inc., Appellants (Defendants Below),**

v.

**John WAYMIRE, d/b/a Waymire Instruments, Appellee (Plaintiff Below).**

No. 2-177A1.

Court of Appeals of Indiana, Fourth District.

Jan. 29, 1980.

Rehearing Denied Feb. 22, 1980.

James L. Beattey, Indianapolis, for appellants (defendants below).

Maurice R. Petit, Robert E. Trout, Indianapolis, for appellee (plaintiff below).

YOUNG, Judge.

This case was transferred to this office in December, 1979 to relieve a disparity of caseloads among the districts.

Hogan Transfer and Storage Corporation and Aero Mayflower Transit Company, Inc. (Hogan-Mayflower) appeal the judgment of the trial court awarding damages to John Waymire, d/b/a Waymire Instruments (Waymire) for negligence in transporting an electronic instrument from Indianapolis, Indiana to Reading, Pennsylvania. The following issues are presented for review:

I. Whether the judgment of the trial court is contrary to law as unsupported by the evidence;

II. Whether a receipt and acknowledgment on the bill of lading by consignee General Battery Corporation that the instrument was received in apparent good condition and without notation of any damage makes the judgment contrary to law;

III. Whether the award of damages exceeds Hogan-Mayflower's contractual liability;

IV. Whether Waymire's proof of damages is speculative, unsupported and fails to follow the established precedent for proving damages.

We affirm.

Waymire developed a prototype battery testing unit for General Battery Corporation (General Battery) in 1971. The instrument was designed to test the life cycle of automotive batteries and consisted of an electronic cabinet, six and one-half feet high and four feet wide, containing sixteen separate units mounted in two rows of eight, fifteen power supply units and a timer and master unit. When the instrument was ready for shipping, he contracted with Hogan-Mayflower to transport it from his place of business in Indianapolis to General Battery's plant in Reading, Pennsylvania.

On August 5, 1971, Waymire and Hogan-Mayflower's driver loaded the instrument onto the truck, with the front or face of the instrument against the wall of the trailer. The instrument was covered with blankets and secured with straps. Hogan-Mayflower delivered the instrument to General Battery on August 9, 1971. Lamar Fitzgerald, an employee of General Battery, signed the bill of lading acknowledging that the instrument had been received in apparent good condition, but it was later discovered to be damaged. Waymire repaired the instrument, filed a notice of claim with Hogan-Mayflower which was denied, and instituted this action. Trial by the court resulted in a finding of $6,700.00 damages for Waymire with a set-off of $141.75 in unpaid freight charges for Hogan-Mayflower. Judgment was entered for Waymire in the sum of $6,558.25.

This case involves an interstate shipment of goods by motor carrier and is, therefore, governed by the Interstate Commerce Act, more particularly the Carmack Amendment, 49 U.S.C. § 20(11), made applicable to common carriers by motor vehicle by 49 U.S.C. § 319. The Carmack Amendment states:

Any common carrier . . . subject to the provisions of this chapter receiving property for transportation from a point in one State . . . to a point in another State . . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it . . . and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier . . . from the liability imposed; and any such common carrier . . . so receiving property for transportation from a point in one State . . . to a point in another State . . . shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such

property caused by it . . . notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void: . . *Provided, however,* That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply . . . to property . . . received for transportation concerning which the carrier shall have been . . expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released . . .

## I.

Hogan-Mayflower argues there is no evidence of record to support the judgment of the trial court, no evidence of any act or failure to act on its part resulting in the damage claimed. It further contends the admissions of record show that the damage, if any, was caused by General Battery.

The court in *Missouri Pacific Railroad v. Elmore & Stahl*, (1964) 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194, set out a carrier's liability under the Carmack Amendment.

The Carmack Amendment of 1906, § 20(11) of the Interstate Commerce Act, makes carriers liable "for the full actual loss, damage or injury * * * caused by" them to property they transport, and

declares unlawful and void any contract, regulation, tariff, or other attempted means of limiting this liability. It is settled that this statute has two undisputed effects crucial to the issue in this case: First the statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." (citations omitted). Second, the statute declares unlawful and void any "rule, regulation, or other limitation of any character whatsoever" purporting to limit this liability. (citations omitted). Accordingly, under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability. (citations omitted).

*Id.* at 137–38, 84 S.Ct. at 1144–1145. The court further stated:

The general rule of carrier liability is based upon the sound premise that the carrier has peculiarly within its knowledge "[a]ll the facts and circumstances upon which [it] may rely to relieve [it] of [its] duty * * *. In consequence, the law casts upon [it] the burden of the loss which [it] cannot explain or, explaining, bring within the exceptional case in which [it] is relieved from liability." (citation omitted). We are not persuaded that the carrier lacks adequate means to inform itself of the condition of goods at the time it receives them from the shipper, and it cannot be doubted that while the carrier has possession, it is the only one in a position to acquire the knowledge of what actually damaged a shipment entrusted to its care.

*Id.* at 143–44, 84 S.Ct. at 1148. The carrier's burden of proof has been likened to a res ipsa loquitur. *Fulton v. Chicago, Rock Island & Pacific Railroad,* (8th Cir. 1973) 481 F.2d 326, 333, cert. denied, 414 U.S. 1040, 94 S.Ct. 540, 38 L.Ed.2d 330.

Hogan-Mayflower argues that Waymire did not make out a prima facie case, citing *Elder & Johnston Co. v. Commercial Motor Freight, Inc., of Indiana,* (1953) 94 Ohio App. 358, 115 N.E.2d 179. The court there held that the rule that, where the shipper shows the goods were received in good condition by the carrier for shipment and were delivered in a damaged condition, a prima facie case of liability is made against the carrier has no application where the goods, after being received by the consignee, are transported to another portion of his premises where the damage is discovered and there is no evidence of the care exercised by the consignee in transporting the goods. It is unclear whether the Ohio court was applying federal or state law, as it cited no authority for this point of law. Nevertheless, Hogan-Mayflower asserts the facts there are foursquare with those of the instant case. The damage was discovered after the instrument had been unloaded from Hogan-Mayflower's truck, but we find a significant distinction. The Ohio court clearly stated that "there is not a scintilla of evidence showing the care exercised by the plaintiff's employees in handling the crates from the time they were taken from the truck until they were opened on the third floor." *Id.,* 115 N.E.2d at 180.

In the instant case there is more than a scintilla of evidence showing the care of General Battery's employees in handling the instrument. Both Herb Yoder and Lamar Fitzgerald, employees of General Battery who assisted in the unloading, denied that they or any other General Battery employee had damaged the instrument during the unloading process. At least two employees steadied the instrument while Yoder placed it on a forklift truck, moved it approximately twenty feet and set it on a skid.

Waymire made out a prima facie case of Hogan-Mayflower's liability. He presented evidence that the instrument was delivered to Hogan-Mayflower in apparent good condition, that it arrived in damaged condition, that the damage was not caused by General Battery, and he established the amount of his damages. Thereafter, the burden shifted to Hogan-Mayflower to show that it was free from liability.

Hogan-Mayflower contends Waymire's own evidence affirmatively and conclusively proved that any damage to the instrument was caused by General Battery. The record discloses that General Battery's employees used a railroad jack to raise the instrument in order to place it on the forklift truck. When questioned about the placement and use of the railroad jack, Lamar Fitzgerald testified:

"A: Yes, because I think one of the panels loosened up a little, the end panel.

Q: When you put the jack under?

A: Yes, right."

Hogan-Mayflower argues that this, coupled with the fact that the instrument did not completely fit on the forklift truck and was, therefore, dragged or scooted across the floor, conclusively proves that General Battery caused the damage, making the judgment for Waymire contrary to law.

This evidence, it is asserted, rebuts Waymire's prima facie case. Hogan-Mayflower insists the damage was caused by jacking-up the left front corner of the instrument to which some of the individual testing units were attached, with the result that the units were sprung out of place. Waymire testified, however, that the front of the instrument had been pushed in or banged against something causing the individual units to come loose and fall down upon each other. As the instrument had been loaded upon Hogan-Mayflower's truck with the front of the instrument facing the wall of the trailer, the inference that it had somehow been forced against the wall of the trailer, thereby causing the damage, was clearly presented. Further, when cross-examined, Waymire testified that the

type of damage that occurred would require a horizontal blow, and that raising the instrument with a railroad jack, placing it on a forklift truck and sliding it out of the trailer would not have damaged it in this manner.

As an appellate court, we will neither weigh the evidence nor substitute our judgment for that of the trial court merely because we might feel disposed to rule differently; it is only where the evidence is without conflict and can lead to but one conclusion and the trial court has reached the opposite conclusion that we will set aside the decision of the trial court as being contrary to law. *American Bus Lines v. Page*, (1978) Ind.App., 373 N.E.2d 928; *Arnold v. Parry*, (1977) Ind.App., 363 N.E.2d 1055. The evidence of the cause of damage to the instrument is clearly conflicting and does not lead to but one conclusion. Therefore, the decision of the trial court is not contrary to law.

## II.

Hogan-Mayflower urges that the judgment of the trial court is contrary to law for the reason that, at the time of the delivery of the instrument to General Battery, it received a receipt and acknowledgment on the bill of lading from the latter that the shipment was received in apparent good condition, with no notation of damage on the inventory. Apparently Hogan-Mayflower contends this receipt and acknowledgment has some special effect on this case, although its sole citation to authority on this issue is *Elder & Johnston Co., supra*, which contains no mention of such a receipt and acknowledgment on a bill of lading.

A bill of lading traditionally has been seen as having a dual character. It is a receipt stating the quantity, character and condition of the goods received, and it is a contract by which the carrier agrees to transport the goods described therein and to deliver them to a certain person at a certain place under the terms and conditions set out in the written instrument. *Louisville, Evansville and St. Louis Railroad v. Wilson*, (1889) 119 Ind. 352, 21 N.E. 341. The general principle of law is that so far as a bill of lading is in the nature of a receipt, or an acknowledgment of the quantity and condition of the goods delivered, it may, like any other receipt, be explained, varied, or even contradicted. *Id.*, 21 N.E. at 342; *see also*, Annot., 67 A.L.R.2d 1028 (1959).

Therefore, the receipt and acknowledgment by General Battery is evidence that Hogan-Mayflower is not responsible for the damage to the instrument, but it is not conclusive evidence of that fact. Lamar Fitzgerald testified that he signed the receipt and acknowledgment before he had an opportunity to inspect the instrument. The damage was discovered after the instrument had been unloaded from the trailer and after the receipt and acknowledgment had been signed.

The presence of the receipt and acknowledgment on the bill of lading, and the evidence tending to contradict it, merely adds to the conflict in the evidence as discussed in Part I of this opinion. For the same reasons, we cannot say the judgment of the trial court was contrary to law.

## III.

Hogan-Mayflower next argues that the judgment of the trial court exceeds its contractual liability for damages. The bill of lading contained a notation that the instrument was released at a value of $5.00 per pound as the carrier's maximum liability for loss or damage. The total weight of the instrument was 1,050 pounds. Therefore, Hogan-Mayflower's maximum liability would be $5,250.00.[1]

After passage of the Carmack Amendment in 1906, discussed in Part I of this opinion, both interstate shippers and carri-

1. Further, Hogan-Mayflower asserts this maximum liability amount applies only in the event of total loss and that there was not total loss here. In its brief, however, it refers us to no case authority or contractual provision that would support this position. While, as will be discussed, the shipper and carrier may agree to a maximum dollar limit on carrier's liability, we find no support in the statute or the contract for any such qualitative restriction.

ers were chargeable with knowledge of the content of the schedules filed with the Interstate Commerce Commission and were conclusively presumed to have contracted according to them in respect to rates and liability unless there was proof of rebating or false billing. *Atchison, Topeka & Santa Fe Railway v. Robinson*, (1914) 233 U.S. 173, 34 S.Ct. 556, 58 L.Ed. 901. However, after the first Cummins Amendment, 38 Stat. 1196, was adopted in 1915, no interstate common carrier could contract for limited liability unless the goods shipped were somehow hidden from view and the carrier was not notified of their character. In that event, the carrier could require the shipper to specifically state the value of the goods in writing, thereby limiting its liability to the amount so stated. Contractual limitation of liability was closely circumscribed and valuation in writing by the shipper was made a condition precedent to the carrier's right to make limitation agreements at all; otherwise the carrier was liable for the full value of the goods. *Caten v. Salt City Movers & Storage Co.*, (2d Cir. 1945) 149 F.2d 428, 431.

The second Cummins Amendment, 39 Stat. 441, adopted in 1916, made further changes in § 20(11). As the law now stands, any attempt to limit liability is prohibited except upon a declaration of value by the shipper in writing or upon a released value agreed to in writing. *Id.*, 149 F.2d at 432.

This statutory proviso permitting a carrier to limit its liability to a declared or released value codifies a common law distinction between a contract exempting a carrier from liability for negligence and one whereby, in consideration of a lesser shipping rate, the shipper agreed to a value by which the carrier's liability was to be measured in the event of loss or damage to the shipment; the latter was valid, the former void. *Bauer v. Jackson*, (1971) 15 Cal. App.3d 358, 93 Cal.Rptr. 43, 48. Under both the common law and the statute, however, a choice of rates with an opportunity to purchase greater protection by paying a higher rate is essential to the validity of

such arrangements. *New York, New Haven & Hartford Railroad v. Nothnale*, (1953) 346 U.S. 128, 135, 73 S.Ct. 986, 97 L.Ed. 1500; *Bauer v. Jackson, supra*, 93 Cal.Rptr. at 48.

The question before us, then, is whether the $5.00 per pound released value was "agreed upon in writing" by Waymire within the meaning of § 20(11). Hogan-Mayflower insists that the released value is a contractual term in the bill of lading and may not, therefore, be varied by parol testimony, citing *Kemper Mill & Elevator Co. v. Hines*, (1922) 293 Mo. 88, 239 S.W. 803. The law is equally clear that if a person's signature is obtained by trick or artifice, the contract may be invalidated. *Chandler v. Aero Mayflower Transit Co.*, (4th Cir. 1967) 374 F.2d 129. Further,

[i]n cases where . . . questions of mistake and fraud are raised in connection with the formation of contracts limiting the liability of a common carrier, relevant circumstances and policies call for a not so strict application of pertinent principles of contract law to afford reasonable protection to the shipper. This is so because arrangements limiting liability contravene a strong public policy expressed in the common law come within a carefully defined exception to the general thrust of Section 20(11) of the Interstate Commerce Act placing on the carrier absolute liability for damage, and are in operation attended by characteristics of an adhesion contract.

*Id.* at 135.

The instant case does raise questions of mistake in the formation of the contract limiting Hogan-Mayflower's liability. Waymire testified he told Hogan-Mayflower's driver that the instrument was expensive and that he wanted it "insured" for the maximum. The driver wrote the $5.00 per pound released value and Waymire signed the bill of lading. In addition, Waymire's copy of the bill of lading referred to Tariff 143-A on file with the I.C.C., while the copy of the bill of lading Hogan-Mayflower introduced at trial showed that "143-A" had been crossed-out and "142-B" written

above it. Larry Beeson testified that Hogan-Mayflower's Revenue Accounting Department reviewed the "paperwork" for every shipment in order to determine the proper billing in accordance with the applicable tariff. Apparently Tariff 143–A was not the proper tariff for the shipment involved here. Tariff 143–A applies to moving "first proviso" household goods while Tariff 142–B applies to moving "third proviso" items of value that require a special carrier, such as electronics equipment. While Beeson could not state with certainty when the change had been made on the bill of lading, the trier of fact could have inferred that the change was made after Waymire had signed the document and perhaps even after the instrument had been delivered to General Battery.

Hogan-Mayflower argues that the Revenue Accounting Department procedure merely resulted in a change in the shipping rate charged Waymire, not a unilateral alteration of the terms of the contract. The final bill to Waymire called for payment of $115.50, while the original bill of lading called for payment of $141.75 in shipping charges. This difference is attributable to the fact that under Tariff 142–B, a $5.00 per pound released value called for the "base rate," while that same released value was treated as an additional liability charge under Tariff 143–A, which added $26.25 to the base rate. However, the provisions of the tariff filed with the I.C.C. enter into and form a part of the contract for interstate shipment. *See New York Central Railroad v. Lazarus,* (2d Cir. 1922) 278 F. 900, cert. denied, 266 U.S. 612, 45 S.Ct. 95, 69 L.Ed. 467; *D'Utassy v. Southern Pacific Co.,* (1916) 174 App.Div. 547, 161 N.Y.S. 222, cert. denied, 250 U.S. 639, 40 S.Ct. 57, 63 L.Ed. 1184.

█ If we apply general principles of contract law, we have difficulty determining exactly what agreement was made between the parties, whether it was a contract governed by Tariff 143–A or Tariff 142–B. The effect of such a determination can be seen by examining the provisions of the two tariffs. Tariff 143–A, Rule 3(b) provides:

The carrier's maximum liability shall be either, (1) $1.25 times the actual weight (in pounds) of the shipment or the declared lump sum value, which ever is greater; or (2) sixty (60) cents per pound for the actual weight of any lost or damaged article or articles, if the shipment has been expressly released by the shipper to such value per article. Unless the shipper expressly releases the shipment to a value not exceeding 60 cents per pound per article, the carrier's maximum liability for loss and damage shall be either the lump sum value declared by the shipper or an amount equal to $1.25 for each pound of weight in the shipment whichever is greater.

The face of the bill of lading contains similar language directed to the shipper in red print. There is no provision for a $5.00 per pound released value under Tariff 143–A. Tariff 142–B, however, provides a minimum released value of $5.00 per pound and a maximum released value of $10.00 per pound. Since Tariff 143–A makes no provision for a $5.00 per pound released value, a contract governed by that tariff and containing such a provision would be invalid by virtue of 49 U.S.C. § 6(7), which prohibits extending to any person or shipper any privileges or facilities except as specified in the tariffs, with the result that there would be no released value and the carrier would be liable for full actual value as at common law. *Booxbaum v. Atlantic Coast Line Railroad,* (1947) 272 App.Div. 496, 71 N.Y. S.2d 511.

We cannot say Waymire "agreed in writing" to a $5.00 per pound released value under Tariff 142–B. He contends that "142–B" was written on the bill of lading after he had signed it. Courts have retreated from the harsh results created by the conclusive presumption that shippers and carriers contracted with knowledge of the schedules and tariffs filed with the Interstate Commerce Commission. *New York, New Haven & Hartford Railroad v. Nothnale, supra; Mitchell v. Union Pacific Railroad,* (9th Cir. 1957) 242 F.2d 598; *Bauer v. Jackson, supra.*

Nor can we say Waymire agreed to the $5.00 per pound released value in consideration of a lower shipping rate under Tariff 142–B. Indeed, Waymire's copy of the bill of lading shows he was willing to pay an increased cost under Tariff 143–A in order to receive greater protection for his instrument. There is no evidence that he was informed of the various shipping rates available under Tariff 142–B depending upon released value.

The trial court made no special findings of fact or conclusions of law, and apparently neither party requested such. Given a general finding in favor of the plaintiff, we must affirm the judgment of the trial court if it is sustainable on any legal theory which the evidence supports. *Hunter v. Milhous*, (1973) 159 Ind.App. 105, 305 N.E.2d 448. Based upon the evidence in the instant case, the trial court could have determined that the parties agreed to a released value of $5.00 per pound in a contract for shipment governed by Tariff 143–A, in which case the released value would be invalid under 49 U.S.C. § 6(7). Alternatively, the trial court could have found that the released value was a result of mistake or fraud, or that Waymire was not given an opportunity to purchase greater protection by paying a higher rate under the correct tariff, with the result that the $5.00 per pound released value was not "agreed upon in writing." Under any or all of these theories, Hogan-Mayflower would be liable for the full actual loss, there being no contractual limitation of liability.

### IV.

Lastly, Hogan-Mayflower contends Waymire's proof of damages is speculative, unsupported and does not follow the established precedent for proving damages. The specific complaints are that Waymire's measure of damages involved cost of repair rather than diminution in market value and that the only evidence of the cost of repair was Waymire's own testimony as to the number of hours he spent repairing the instrument and the "going rate" for such work.

We note that Hogan-Mayflower's Motion to Correct Errors asserted only that the trial court's award of damages was excessive. The argument there was that Waymire worked on the production of the instrument from January 1, 1971, to around August 1, 1971, a total of 1200 hours based upon a 5 day work week or 1440 hours based upon a 6 day work week (apparently based upon the assumption that Waymire did nothing else during this period than build his battery tester) and by dividing Waymire's selling price to General Battery by the "total hours," Waymire earned $10.70 an hour for a 5 day week or $8.92 an hour for a 6 day week. Therefore, a $6,700.00 award of damages for 360 hours of repair was excessive.

The issue presented in this court, was not presented to the trial court in the Motion to Correct Errors and has, therefore, been waived on appeal pursuant to Ind.Rules of Procedure, Trial Rule 59(G). If we reach the merits of the issue, however, Waymire is not restricted to diminution in market value as the measure of his damages, nor is his proof of damages speculative and conjectural.

49 U.S.C. § 20(11) states that a common carrier shall be liable for the "full actual loss, damage, or injury." The general common law measure of damages in cases of unreasonable delay and damage of goods in shipment is the difference in the market value of the goods at the date and in the condition they were contracted to arrive at their destination and the date on and the condition in which they actually arrived. *Great Atlantic & Pacific Tea Co. v. Atchison, Topeka & Santa Fe Railway*, (7th Cir. 1964) 333 F.2d 705, cert. denied, 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560. The "market value rule" has been adopted as a method to ascertain "actual damages" under the Carmack Amendment, and "[s]ince the market value rule is merely a method, it is not applied in cases where it is demonstrated that another rule will better compute actual damages." *Id.* at 708. The nature of the property damaged may clear-

ly indicate that change in market value will not compensate for actual loss, leading the court to award damages measured by cost of repair. *See, Olsen v. Railway Express Agency, Inc.,* (10th Cir. 1961) 295 F.2d 358.

In the instant case, the instrument was a prototype, made to order for General Battery. Because of the unique nature of the instrument, ascertaining its market value before and after the damage would be difficult, if not impossible. Therefore, the cost of repair better measures Waymire's actual loss.

Hogan-Mayflower insists that an award of damages under the Carmack Amendment cannot be based upon conjecture or speculation, but must be determined on some rational basis, citing *Association of Maryland Pilots v. Baltimore and Ohio Railroad,* (D.Md.1969) 304 F.Supp. 548. The award of damages here does rest upon some rational basis. Waymire testified that he spent 360 hours repairing the instrument and that the "going rate" at the time in the Indianapolis area for persons doing such work was $25.00 an hour. He presented facts from which the court could have determined the amount of damages. There is no evidence to contradict these figures and no evidence that the hourly rate or the time spent was excessive. Furthermore, the cost of repair does not exceed the original contract price between Waymire and General Battery.

The judgment of the trial court is affirmed.

MILLER, P. J., and CHIPMAN, J., concur.