## FIREMAN'S FUND INSURANCE COMPANIES and Raphaely Sevy, Plaintiffs,

v.

## BARNES ELECTRIC, INC., and United Air Lines, Inc., Defendants.

### No. S 81–102.

United States District Court,
N. D. Indiana,
South Bend Division.

June 7, 1982.

---

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

### A.

Defendant United Air Lines filed Motion for Partial Summary Judgment on May 18, 1982. The plaintiffs responded June 1, 1982.

On May 4, 1982, Sevy filed his Amended Complaint in this action alleging that defendant United Air Lines, Inc. ("United"), had breached its agreement and/or acted in a negligent fashion in failing to complete a shipment of Sevy's art from Miami Beach, Florida to South Bend, Indiana, pursuant to Uniform Air Bill No. 007–1315–8331 (hereinafter referred to as "United's Air Bill"). United filed its Motion for Partial Summary Judgment and Memorandum in support thereof alleging that certain tariffs on file with the Civil Aeronautics Board ("CAB"), at the time Sevy shipped his art had the force and effect of law thereby limiting Sevy's recovery to $.50 per pound of cargo. Alternatively, United argued that in the event the tariffs did not have the force and effect of law, they were incorporated into United's Air Bill and thereby similarly limit United's liability to Sevy. Finally, in the event the tariffs have no application in this matter, United contends that Item 3 on the back of United's Air Bill limited its liability to Sevy to an amount not in excess of $9.07 per pound of cargo.

The intent of the Airline Deregulation Act of 1978, 49 U.S.C.A., § 1551, *et seq.*, as well as the regulations implemented pursuant thereto, establish that at the time Sevy shipped his art to South Bend, Indiana on March 21, 1979, any tariffs on file by United did not have the force and effect of law and did not limit Sevy in any way from recovering against United for the full value of the cargo destroyed in the fire at the Towne Air Freight Building on March 24, 1979.

In March 1979 at the request of Hebrew Orthodox Congregation Synagogue in South Bend, Indiana, Sevy, a well known Israeli artist, agreed to exhibit a portion of

Brian S. Schuster, South Bend, Ind., Robert G. Weddle, Joseph E. DeGroff, Indianapolis, Ind., Ronald L. Giroux, Miami, Fla., for plaintiffs.

R. Kent Rowe, Louis C. Chapleau, South Bend, Ind., for defendants.

his art in a South Bend show. The exhibition was to be from March 28, 1979 to April 1, 1979. In preparation therefor, Sevy's wife arranged to have the art chosen for the show picked up at Sevy's studio for shipment to South Bend, Indiana. (S. 16). While Sevy did not know the name of United's agent who came to pick up the art, the man who came to Sevy's studio on March 21, 1979, had on several previous occasions shipped portions of Sevy's art collection. (S. 17, 23, 14). As was determined by the signature on United's Air Bill, the man who came out to Sevy's studio was a Mr. J. Besselli. (S. 24).

Upon Besselli's arrival at Sevy's studio, Sevy was in the process of preparing boxes for shipment. Sevy personally made his own boxes due to the fact that different paintings of different sizes required different crate arrangements. (S. 11, 85). At the time Besselli arrived, Sevy was in the process of sealing the remaining boxes and Besselli saw and, in fact, helped Sevy place several paintings in the boxes. (S. 25, 86). Besselli filled out what Sevy believed to be a "questionnaire," (S. 17), providing Besselli only with information as to where the art was to be delivered and that he wanted it to get there "as soon as possible." (S. 17, 25).

While, unfortunately, Sevy's wife was not at the studio on March 21, 1979, she had historically been responsible for making arrangements to ship Sevy's art. As stated by Sevy; "She make all the arrangements all the time. This is unfortunate. I am artist. I paint." (S. 15). Sevy's only concern, which he expressed to Besselli, was that the art arrive on time. (S. 15). Despite his knowledge of what was being shipped, Besselli filled in the term "P/E" as well as every other item written on United's Air Bill. (S. 24). While Sevy had absolutely no knowledge of the term "P/E", Mr. Lekarczyk testified that it is a term commonly used by air carriers to mean "personal effects". (S. 26, L. 24).

The only portion of the Air Bill personally completed by Sevy was his signature. (S. 24, 25). Before signing the document, Sevy did not read any portion thereof, including the reverse side of the document or any language contained in the upper right hand corner. (S. 25, 26, 27). Sevy never discussed with Besselli or any one else connected with United any "conditions" contained within United's Air Bill. (S. 17). In fact, Sevy was not even aware that he was executing a contract. (S. 17, 23, 41).

After Besselli left Sevy's studio, Sevy contacted a representative of the Hebrew Orthodox Congregation and informed him that he would be in South Bend on Sunday in order to prepare for the exhibition. (S. 12). Upon his arrival on Sunday, Sevy was not informed of what had transpired until his wife contacted him by telephone. (S. 30). In fact, although United no longer has any records for purposes of verification, it is believed that the shipment arrived in South Bend, Indiana sometime on either March 22 or 23, 1979, and was then placed in United's Freight Room which formed a part of the Towne Air Freight Building. (L. 11–13, 31–33). Despite the clear instructions contained on United's Air Bill to "deliver upon arrival at once," based upon United's own operating policies and on their own volition, Sevy's shipment was placed in United's Freight Room and was to remain there until such time as a representative of the Synagogue could be contacted to make arrangements for delivery. (L. 11, 12, 21, 34). On Saturday, March 24, 1979, Mr. Lekarczyk attempted to make telephone contact at the Hebrew Orthodox Congregation Synagogue. (L. 31–32). However, due to the fact that Saturday is the Jewish sabbath, no one answered the telephone calls at the Synagogue.

Later that evening on March 24, 1979, a fire occurred at the Towne Air Freight Building in which, among other things, Sevy's entire shipment of art was totally destroyed. After the fire, Mr. Lekarczyk, as well as Sevy, saw wet and burnt paintings hanging at United's temporary freight room. (S. 35, L. 36). While Sevy was allowed to view the destroyed art, he was not allowed to take any items from the scene. (S. 34–35). To the best of Mr. Lekarczyk's knowledge, United personnel have at no

time attempted to salvage any of the freight lost in the fire (L. 82), and United has never returned any of the paintings or accounted in any other way to Sevy since the time of the fire.

## B.

■ The initial argument in United's Motion for Partial Summary Judgment concerns the effect of the Airline Deregulation Act of 1978, 49 U.S.C.A., § 1551 et seq., as well as the regulations implemented by the CAB pursuant thereto, on United's tariffs at the time Sevy shipped his art on March 21, 1979. United contends that despite the clear language of the statute and regulations to the contrary, the exemption of domestic air cargo carriers from the duty to file tariffs did not change the previously established rule of law that such tariffs had the force and effect of law. A review of the regulations passed by the CAB, as well as the leading case interpreting those regulations, establishes that one of their purposes was to make filed tariffs ineffective ninety days after the effective date of the regulation. As a result thereof, United's tariffs had no effect on the date Sevy shipped his art to South Bend, Indiana.

As discussed in United's Summary Judgment Memorandum, 14 C.F.R. § 291.30, et seq., exempts air cargo carriers such as United from the duty to file tariffs. Those regulations were implemented pursuant to CAB Order ER–1080, 45 Fed.Reg. 53628 (November 16, 1978), and later challenged by a group of air carriers in *National Small Shipment Traffic Conference, Inc. v. CAB*, 618 F.2d 819 (D.C.Cir.1980) (hereinafter referred to as *"Traffic Conference"*). This case was neither cited or mentioned by the defendant United. Despite United's content that the "primary emphasis of the Airline Deregulation Act was the eventual termination of the Civil Aeronautics Board ("United's Summary Judgment Memorandum, p. 6), excerpts from the historical overview to deregulation contained in *Traffic Conference* show that in fact, significant and fundamental changes to the entire air cargo industry were contemplated. As was stated in *Traffic Conference* :

These cases arise against a background of fundamental changes in Congress' approach to the air transportation industry. For over 40 years, under the Federal Aviation Act, 49 *U.S.C.* § 1301 et seq. (1976) (and its predecessor, the Civil Aeronautics Act of 1938, 52 Stat. 977), the industry was subjected to a system of detailed economic regulation which this Court has characterized as "severely anti-competitive." *United States v. CAB*, 511 F.2d 1315, 1322 (D.C.Cir.1975). *Traffic Conference*, at 822.

.        .        .        .

Carriers were required to set forth their rates, rules, and practices in tariffs filed with the CAB and to comply strictly with these tariffs. *Traffic Conference*, at 822. Major changes in the approach to the domestic air cargo transportation industry were signaled by the enactment of the Cargo Deregulation Legislative Amendments to the Federal Aviation Act, Pub.L.No.95–163, 91 Stat. 1278. The amendments completely overhauled the provisions of the Act pertaining to air cargo transportation. Congress stated that "encouragement and development of an integrated transportation system relying upon competitive market forces to determine the extent, variety, quality, and price of such services" is in the public interest.

.        .        .        .

In order to determine the ground rules that would govern the provision of domestic air cargo transportation under the new regime, the Board [CAB] initiated the rule making proceedings leading to the regulations challenged by these petitioners. The Board's notice of proposed rulemaking set forth proposed rules on a variety of issues. Many of these proposals were substantially adopted in the final regulations and are not challenged by the petitioners in these cases.

Pertinent for our purposes was the Board's proposal to exempt air cargo carriers from the tariff and agreement filing requirements and the duty to carry provi-

sions of the Act. *Traffic Conference*, at 823.

.    .    .    .    .

The Board requested comments on the proposed rules from interested members of the public.

.    .    .    .    .

During the comment period, Congress enacted the Airline Deregulation Act of 1978, Pub.L.No.95–504, 92 Stat. 1705, which substantially revised the entire Federal Aviation Act.

.    .    .    .    .

On November 8, 1978, the Board adopted Regulation ER–1080, Operating Rules For All-Cargo Carriers and Domestic Cargo Transportation by Section 401 and 418 Carriers, which reissued part 291 of its economic regulations titled General Rules For All-Cargo Carriers, 14 *C.F.R.* Part 291 (1979). Insofar as is pertinent for our purposes, the Board adopted the proposal to exempt carriers from the agreement and tariff filing requirements and a statutory duty to carry. *Traffic Conference*, at 825.

Thus, the purpose and intent of Congress in deregulating the air cargo industry was to return the industry to "competitive market forces" based upon the contractual relationships between carriers and shippers.

The basic regulation exempting air carriers from filing tariffs is found at 14 *C.F.R.* § 291.31. United contends that the Airline Deregulation Act and its implementing Order are silent as to the contractual effect of tariffs already on file. (United's Summary Judgment Memorandum, p. 7). However, 14 *C.F.R.* § 291.31 specifically states:

> Note: Tariffs already on file with the Board may remain *in effect* for not longer than ninety days after the effective date of this rule. (emphasis added).

Thus, the plain and unambiguous language of the regulation itself establishes that tariffs already on file would no longer be effective after February 9, 1979, which date was ninety days after the November 9, 1978 effective date of the regulation.

The comments implementing Part 291 as a final rule also explicitly discuss the effectiveness of tariffs currently on file with the CAB. 43 *Fed.Reg.* 53635 (November 16, 1978). The CAB stated:

> Carriers that have effective tariff rules and rates on file with the Board will be allowed to maintain them in effect for ninety days from the effectiveness of this rule, so that they will have sufficient time to arrange for alternative methods of rate and rule publication. 43 *Fed.Reg.* at 53631.

The CAB also noted by way of a footnote to the above quoted language that on November 2, 1978, Delta Airlines had filed a Motion to stay the effectiveness of the exemption in order to allow time for carriers to establish new shipping documents. The CAB denied Delta's request based upon the fact that by allowing carriers, at their option, to keep their tariffs in effect for ninety days from the effective date of the rule, carriers would be able to move to a non-tariff system should they desire to do so. These statements by the CAB make it clear that as far as it was concerned, pursuant to 14 *C.F.R.* § 291.31, tariffs currently on file with the CAB would be of no force and effect after February 9, 1979. Accordingly, United's tariff on file with the CAB on March 21, 1979 had no effect whatsoever upon the shipment of art to South Bend, Indiana.

The decision in *Traffic Conference* further supports the proposition that filed tariffs were of no force and effect after the time period contemplated in 14 *C.F.R.* § 291.31. As is stated in *Traffic Conference*:

> The Air Carriers concede, as they must, that the literal language of Sections 416(b) and 418(c) authorizes the Board to exempt carriers from the tariff filing requirement.

.    .    .    .    .

> Thus, as petitioners concede, the plain language of the statute authorizes the Board's action. A court interpreting a statute is bound by the "literal or usual meaning of its words" unless this would

lead to "absurd results ... or would thwart the obvious purpose of the statute". This case does not present an instance in which a literal interpretation of the language of the statute leads to an absurd result or conflicts with the obvious purpose of the Act. The basic purpose of the 1977 and 1978 amendment to the Act was to deregulate the air transportation industry. Authorizing the Board to grant exemptions from any provision of the Act is quite consistent with, and indeed could further, that goal. Thus the literal language of the statute should control the disposition of this case. (citations omitted). *Traffic Conference* at 827–8.

After an extensive and well reasoned analysis of the challenged regulations, the Court of Appeals for the District of Columbia held that the CAB had ample authority to issue the regulations exempting domestic air cargo carriers from the duty to file tariffs with the CAB. *Traffic Conference*, at 830.

In attempting to have this Court construe the applicable regulations as continuing to afford filed tariffs the force and effect of law, United has disregarded the explicit language of the implementing regulation itself which states that filed tariffs would no longer be effective after February 9, 1979. As was done in *Traffic Conference*, the Court in this action should follow the literal language of the regulation since to do so does not lead to an absurd result and in fact, enhances the obvious purpose of the Airline Deregulation Act of 1978.

### C.

■ United takes the position that Florida law applies in this action. A majority of the jurisdictions, including both Indiana and Florida, have held that a carrier must afford a shipper a fair opportunity to choose between higher or lower liability in order to validly limit the carrier's liability. Further, questions concerning the validity of tariffs or contracts limiting liability of carriers engaged in interstate transportation are to be determined in accordance with federal law. See, *e.g., Hefner v. Ow-*

*ens*, 280 P.2d 1025 (Okla.1955); *Hoagland v. Railway Exp. Agency*, 75 So.2d 822 (Fla. 1954). It is a fundamental and essential prerequisite to the validity of any attempt by a carrier to limit its liability that the shipper be given a "fair opportunity" to choose between a higher or lower liability by declaring a correspondingly greater or lesser value for the goods shipped. *New York, N.H.H.R. Co. v. Nothnagle*, 346 U.S. 128, 73 S.Ct. 986, 97 L.Ed. 1500 (1953); *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir. 1978); *Chandler v. Aero Mayflower Transit Company, Inc.*, 374 F.2d 129 (4th Cir. 1967); *Cordingley v. Allied Van Lines, Inc.*, 413 F.Supp. 1398 (D.Mon. 1976); *Allied Van Lines, Inc. v. Bratton*, 351 So.2d 344 (Fla.1977); *Trans-American Van Service, Inc. v. Shirzad*, 596 S.W.2d 587 (Tex.Ct.App.1980); *Hogan Transfer and Storage Corporation v. Waymire*, 399 N.E.2d 779 (Ind.Ct.App.1980); *Semi Metals, Inc. v. Pinter Brothers*, 126 N.J.Super. 124, 312 A.2d 892 (1973); *The Travelers Insurance Company v. Delta Air Lines, Inc.*, 498 S.W.2d 443 (Tex.Civ.App.1973); *Muelder v. Western Greyhound Lines*, 8 Cal.App.3d 319, 87 Cal.Rptr. 297 (1970). Thus, before United can claim to have limited its liability in this action, it must show that Sevy had a "fair opportunity" to make an informed choice concerning a declaration of value. Any such determination is dependent upon analysis of numerous fact questions which cannot properly be resolved by way of a motion for summary judgment.

In *Trans-American Van Services, Inc. v. Shirzad, supra,* the Court was faced with an action by Shirzad for loss of and damage to household goods moved from Maryland to Texas by Trans-American Van Services, Inc. After entry of a judgment awarding $18,280.00 to Shirzad, Trans-American appealed based, among other things, upon the fact that a valid limitation of liability was contained in the bill of lading for the goods. 596 S.W.2d at 588. The Court in *Shirzad*, citing *New York, N.H.H.R. Co. v. Nothnagle, supra.*, stated the proposition that an essential prerequisite to the validity of a carrier's attempt to limit liability is that the shipper be given a "fair opportunity to

choose between higher or lower liability by paying a correspondingly greater or lesser charge." 596 S.W.2d at 590. The Court also discussed what is meant by "a fair opportunity to choose" and stated:

> Beginning with the statement in *Nothnagle* concerning the "fair opportunity to choose," the federal cases appear to have retreated from the harsher rule enunciated in earlier cases that the shipper is bound by the terms of limitation of liability contained in documents or schedules which he might never have seen. The Courts now require "reasonable notice" to the shipper, *Chandler v. Aero Mayflower Transit Company*, 374 F.2d 129, 137 (4th Cir. 1967), and, an absolute, deliberate and well-informed choice. *Anton v. Greyhound Van Lines, supra,* 591 F.2d at 108. 596 S.W.2d at 590–91

The Court in *Shirzad* went on to affirm the judgment entered by the trial court and held that the carrier was liable for the full amount of damages to the shipper's property despite the limitation of liability contained in the bill of lading for the goods. 596 S.W.2d at 593.

In *Hogan Transfer and Storage Corporation v. Waymire, supra.,* the Indiana Court of Appeals was faced with an action brought by a shipper against a motor carrier for alleged negligence in transporting a prototype electronic instrument. After a judgment was entered for the shipper, one of the issues raised on appeal was whether the award exceeded the contractual liability of Hogan-Mayflower for damages. 399 N.E.2d at 784. While *Waymire* presents a factual situation subject to the provisions of the Interstate Commerce Act, since that Act provides that any attempt to limit liability is prohibited except upon a declaration of value by the shipper in writing or upon a released value agreed to in writing, the question of what is required of a carrier in order to properly limit its liability is analogous to this issue currently before the Court. In discussing these requirements, the Court in *Waymire* stated:

> Under both the common law and the statute, however, a choice of rates with an opportunity to purchase greater protection by paying a higher rate is essential to the validity of such arrangements.

> .        .        .        .        .

Further,

> [i]n cases where . . . questions of mistake and fraud are raised in connection with the formation of contracts limiting the liability of a common carrier, relevant circumstances and policies call for a not so strict application of pertinent principles of contract law to afford reasonable protection to the shipper. This is so because arrangements limiting liability contravene a strong public policy expressed in the common law come within a carefully defined exception to the general thrust of Section 20(11) of the Interstate Commerce Act placing on the carrier absolute liability for damage, and are in operation attended by characteristics of an adhesion contract. (Citing *Chandler v. Aero Mayflower Transit Co.,* 384 F.2d 129 (4th Cir. 1967)

> 399 N.E.2d at 785.

Despite United's contention that Sevy has not alleged a mistake in the preparation of the Air Bill here in question (United's Summary Judgment Memorandum, p. 14), in light of the fact that Sevy testified that United's agent saw the art being placed in the boxes for shipment, a jury could reasonably conclude that in placing the term "P/E" on the Air Bill, a mistake occurred in this action concerning the formation of a contract limiting the liability of United. In any event, *Waymire* makes clear that the requirement of "a fair opportunity" is not dependent upon a finding of mistake or fraud. As is stated:

> Alternatively, the trial court could have found that the released value was a result of mistake or fraud *or* that Waymire was not given an opportunity to purchase greater protection by paying a higher rate under the correct tariff, with the result that the $5.00 per pound released value was not "agreed upon" in writing. *Under any or all of these theories,* Hogan-Mayflower would be liable for the

full actual loss, there being no contractual limitation of liability. (emphasis added). 300 N.E.2d at 787.

Even in *Allied Van Lines, Inc. v. Bratton, supra.*, a case relied upon by United, the principle is stated that "[I]f a shipper can show ... that he did not have a reasonable and fair opportunity to exercise his right to choose alternative insurance coverage, then the legal consequences of the contract may be avoided." 351 So.2d at 348. Thus, in order to limit its liability, it is clear from the applicable case law that United was required to give Sevy "reasonable notice" and a "fair opportunity" to choose between higher or lower liability by declaring a correspondingly greater or lesser value, based upon an "absolute, deliberate and well-informed choice."

■ In applying the established facts in this action to the rules stated above, at the very least, it can be seen that numerous fact questions exist as to whether Sevy was afforded the "fair opportunity" to which he was entitled. In deciding whether a genuine issue of fact exists for purposes of a motion for summary judgment, the party against whom the motion is made is entitled to the benefit of every inference that may reasonably be drawn in his favor. Further, the Court should not supplant the jury if there is any room whatsoever for disagreement. *See e.g., Chandler v. Aero Mayflower Transit Company*, 374 F.2d 129 (4th Cir. 1967).

■ A jury could conclude that Sevy was not afforded a "fair opportunity". Sevy had a very limited understanding of the English language and United's agent, Mr. Besselli, who came out to pick up the art knew this because he had talked with Sevy before. Despite the fact that Besselli had dealt previously with Mrs. Sevy, he did not inquire of her whereabouts in this instance, but rather took it upon himself to fill out the Air Bill inquiring only of Sevy as to the destination for the shipment. Further, despite the fact that Besselli saw fine art being placed in the boxes, without advising Sevy in any way whatsoever, Besselli decided on his own to place on the Air Bill the

term "P/E" denoting personal effects. Besselli then simply had Sevy sign the Air Bill and took the boxes away for shipment to South Bend, Indiana. While United makes much of the fact that Sevy had shipped art before, this certainly does not mean he was not entitled to the same "fair opportunity" as he would have been with any other shipment.

**D.**

Sevy contends that the language contained in United's Air Bill did not limit United's liability to Sevy for his damages suffered in this action.

In *Chandler v. Aero Mayflower Transit Company*, 374 F.2d 129 (4th Cir. 1967), the Court was faced with an action by a shipper against a motor carrier to recover the value of household property destroyed in a fire. While the Court made reference to the question of "fair opportunity," the basis for the Court's decision was the fact that jury questions existed as to whether the shipper knew at the time he signed the bill of lading that he was signing a contractual document as opposed to additional copies of inventory sheets. 374 F.2d at 133. In discussing the issue of whether a valid agreement existed, the Court stated:

In determining whether there was "agreement" upon a released value, Courts are, therefore, to apply principles of contract law, and more particularly in the present case the law as it relates to standardized form contracts such as those relied upon by the carrier here.

. . . . .

Ordinarily, one who signs a contract cannot avoid it on the ground that he did not read or that he took someone else's word as to what it contained. But an agreement signed without negligence under the belief that it is an instrument of a different character is void, and the failure to read an instrument is not negligence *per se* but must be considered in light of all surrounding facts and circumstances. (citations omitted) 374 F.2d at 136.

The Court eventually held that jury questions existed as to whether the shipper knew he was signing a contractual document and accordingly, the action was remanded to the trial court for further proceedings. 374 F.2d at 137.

In this action Sevy stated in his deposition, under questioning by United's counsel, that United's agent came to his studio and filled out a "questionaire" and that he was not even aware that the document he signed was a contract. (S. 17, 41). As a result, fact questions exist as to whether Sevy knew at the time he signed the Air Bill that he was in fact signing a contractual document limiting his liability. Pursuant to *Chandler*, such questions are for the jury to decide and would not be appropriately resolved pursuant to a motion for summary judgment.

The defendant United's Motion for Summary Judgment is DENIED.