351 So.2d 344 (1977)
ALLIED VAN LINES, INC., Petitioner,
v.
Ila M. BRATTON, Respondent.
ALLIED VAN LINES, INC., et al., Petitioners,
v.
Roberta McKNAB, Respondent.
Nos. 49517, 49596.
Supreme Court of Florida.
July 14, 1977.
Rehearing Denied November 21, 1977.
*345 Reinald Werrenrath, III of Akerman, Senterfitt & Eidson, Orlando, Arnold R. Ginsberg of Horton, Perse & Ginsberg, Hawkesworth, Schmick, Ponzoli & Wassenberg, Miami, for petitioners.
Joseph H. Williams of Troutman, Parrish & Weeks, Orlando, for Ila M. Bratton, and Richard J. Aaron of Schryver, Hagaman & Aaron, Naples, for Roberta McKnab, for respondents.
HATCHETT, Justice.
May an interstate shipper avoid the legal consequences of a limitation of liability provision contained in a Bill of Lading issued by a carrier and signed by the shipper, on the ground that the shipper did not read the document and therefore did not assent to its provisions? The Fourth District Court of Appeal [Allied Van Lines, Inc. v. Bratton, 330 So.2d 521 (Fla. 4th DCA 1976)] and the Second District Court of Appeal [Allied Van Lines, Inc. v. McKnab, 331 So.2d 319 (Fla. 2d DCA 1976)] answered this question in the affirmative. Conflict is asserted with Atlantic Coast Line Railroad Company v. Dexter, 50 Fla. 180, 39 So. 634 (1905). We have jurisdiction.[1]
*346 Mrs. Bratton, the "shipper," hired Allied Van Lines, Inc., to transport her household goods from Ohio to Florida. At the time the goods were picked up, Mrs. Bratton signed a Bill of Lading, presented to her by agents of the carrier, which contained a provision limiting carrier's liability to $4,500.00, $1.25 per pound. The shipment was destroyed in transit and respondent sued to recover the full value of her goods. Liability was conceded. The sole issue to be determined was the proper amount of damages. It was Allied's contention that its liability was limited by the provision contained in the Bill of Lading. Mrs. Bratton argued that since she did not read the document and was unaware of any provision affecting carrier's liability, she was not bound thereby. The question was submitted to the jury on respondent's assertions of "mistake" and "lack of assent" and a verdict was entered in favor of Mrs. Bratton in the amount of $10,630.00. The Fourth District Court of Appeal affirmed per curiam.
In accordance with I.C.C. Approved Tariff No. 144-C, immediately above respondent's signature on the Bill of Lading in red letters and boldface type, there appeared the following:
UNLESS THE SHIPPER EXPRESSLY RELEASES THE SHIPMENT TO A VALUE OF 60 CENTS PER POUND PER ARTICLE, THE CARRIER'S MAXIMUM LIABILITY FOR LOSS AND DAMAGE SHALL BE EITHER THE LUMP SUM VALUE DECLARED BY THE SHIPPER OR AN AMOUNT EQUAL TO $1.25 FOR EACH POUND OF WEIGHT IN THE SHIPMENT, WHICHEVER IS GREATER.
THE SHIPMENT WILL MOVE SUBJECT TO THE RULES AND CONDITIONS OF THE CARRIER'S TARIFF. SHIPPER HEREBY RELEASES THE ENTIRE SHIPMENT TO A VALUE NOT EXCEEDING ____________________________________________________
(to be completed by the person signing below)
NOTICE, THE SHIPPER SIGNING THIS CONTRACT MUST INSERT IN THE SPACE ABOVE, IN HIS OWN HANDWRITING, EITHER HIS DECLARATION OF THE ACTUAL VALUE OF THE SHIPMENT, OR THE WORDS "60 CENTS PER POUND PER ARTICLE." OTHERWISE, THE SHIPMENT WILL BE DEEMED RELEASED TO A MAXIMUM VALUE EQUAL TO $1.25 TIMES THE WEIGHT OF THE SHIPMENT IN POUNDS.
The space providing for the declaration of "actual value" or "60 cents per pound, per article" was left blank by respondent.
Mrs. Bratton testified that at the time she signed the Bill of Lading she realized that she was signing a contract.[2] She also acknowledged that although she did not read the Bill of Lading, no agent of the shipper prevented her from doing so.[3] In addition, several weeks prior to the move, respondent was personally handed an informational booklet entitled "Summary of Information for Shippers of Household Goods, Form BOP 103." This booklet was an I.C.C. publication and contained a thorough description of all aspects of the move, including the Bill of Lading and the carrier's liability. Respondent signed a receipt for the booklet, which receipt was admitted into evidence.[4]
*347 In the companion case, the "shipper," Mrs. McKnab, contracted with Allied for an interstate move of household goods from California to Florida. When the goods were picked up, Mrs. McKnab explained to the carrier's agent that she wanted all available insurance.[5] The agent affirmatively stated that $1.25 per pound was the maximum possible.[6] The agent not Mrs. McKnab, completed the space providing for selection of coverage, by typing in: "$1.25 per pound per order for service."[7]
The goods were destroyed by a fire while in the possession of the carrier and respondent sued. Again, the carrier admitted liability but maintained that liability was limited to $1.25 per pound ($9,300.00) as provided in the Bill of Lading. Mrs. McKnab contended that she was not bound by the provision contained in the Bill of Lading because she was not given "a reasonable and fair opportunity to value her goods." Judgment was entered in favor of Mrs. McKnab in the sum of $33,315. The Second District Court of Appeal affirmed in part and reversed in part, remanding for new trial on the issue of damages. That court found sufficient competent evidence to support a finding of misrepresentation on the part of Allied but stated that "in measuring plaintiff's [Mrs. McKnab] damages, the proper measure of damages for loss of personal property is its market value on the date of the loss." Allied Van Lines, Inc. v. McKnab, supra, at p. 320.
It has long been held in Florida that one is bound by his contract. Unless one can show facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced *348 by statements of the other party to refrain from reading the contract, it is binding. No party to a written contract in this state can defend against its enforcement on the sole ground that he signed it without reading it. All Florida Surety Company v. Coker, 88 So.2d 508 (Fla. 1956).
As to the validity of a limitation clause contained in a Bill of Lading, this Court, more than 70 years ago, put the issue to rest. In Atlantic Coast Line Railroad Company v. Dexter, supra, 50 Fla. 180, 39 So. at page 635, this Court stated:
The rule is quite generally settled in the United States that an acceptance by a shipper or his agent of a receipt or Bill of Lading containing a limitation of the carrier's liability is binding upon him, when the limitation is not illegal or unreasonable; that it is not essential to the validity of such a limitation that it be shown that the shipper was aware of it, or that he had read it, or that it had been explained to him, or his attention called to it, provided the carrier made use of no improper means to prevent his noticing or objecting to it; and that every shipper is conclusively presumed, in such a case, to have read and assented to the provisions of the receipt or bill of lading given him, whether he in fact assented or not... Under these circumstances it made no difference whether the plaintiffs ever expressly assented to the contract or not, or even read or knew of its terms and conditions. They are fully bound thereby, and are estopped from gainsaying or repudiating it.
The Dexter decision has been followed in an unbroken line of Florida cases. Seaboard Air Line Ry. Co. v. Schenck, 97 Fla. 16, 119 So. 517 (1929); Noone v. Southern Express Co., 79 Fla. 25, 83 So. 607 (1920).
Federal law is in accord. American Express Company v. U.S. Horseshoe Co., 244 U.S. 58, 37 S.Ct. 595, 61 L.Ed. 990 (1917); Rocky Ford Moving Vans, Inc. v. United States, 501 F.2d 1369 (8th Cir.1974); Sorensen-Christian Industries, Inc. v. Railway Express Agency, Inc., 434 F.2d 867 (4th Cir.1970).
We do not consider Chandler v. Aero Mayflower Transit Company, 374 F.2d 129 (4th Cir.1967), primarily relied on by the trial courts below, to be controlling. In Chandler the Fourth Circuit Court of Appeals was dealing with a situation where a shipper signed a Bill of Lading under the mistaken belief that it was not a contractual document at all. The shipper was told (induced not to read) that the papers he was signing were "inventory" papers. In the cases presently before us, there is no evidence of misrepresentation as to the character of the documents signed. Both shippers knew they were signing a contract. Mrs. Bratton simply did not read the documents furnished or even ask questions about the Bill of Lading. Mrs. McKnab's situation is different however, for she sought information, was mislead by the carrier's agent as to available coverage, and was prevented from exercising her right to choose adequate coverage.
In Brannon v. Smith Dray Line & Storage Co., 456 F.2d 260 (6th Cir.1972), it was held that a shipper is not bound by the valuation in a Bill of Lading when not adequately advised concerning alternatives regarding insurance. An interstate shipper may not avoid the legal consequences of a limitation of liability provision in a Bill of Lading on the ground that the Bill of Lading was not read and therefore its provisions not assented to. But, if a shipper can show that he was induced not to read the Bill of Lading or that the legal significance of its provisions were misrepresented, or that he did not have a reasonable and fair opportunity to exercise his right to choose alternative insurance coverage, then the legal consequences of the contract may be avoided.
Accordingly, we hold that the shipper's liability in the Bratton case is limited under the liability provision contained in the Bill of Lading to $4,500.00, and the opinion of the Fourth District Court of Appeal is quashed and the case remanded for action consistent with this opinion; the opinion of the Second District Court of Appeal in the McKnab case is affirmed.
It is so ordered.
*349 OVERTON, C.J., and ADKINS, BOYD, ENGLAND, SUNDBERG and KARL, JJ., concur.
NOTES
[1] Article V, Section 3(b)(3), Florida Constitution.
[2] Okay. I will repeat the question. Did you understand that when you signed the bill of lading on October 22nd, 1973, that you were signing a contract between you and Allied Van Lines covering the move?
A To move me from Canton to Orlando, yes.
[3] Did anyone prevent you or stop you from reading the bill of lading?
A No.
Q Did anyone say anything to you that you took to be an inducement not to read it?
A No. Like I said before, the house was really cold; and the men were tired. They were in a hurry to get out.
[4] Did you read the booklet that you received?
A Yes.
Q Did you read it from front to back?
A Yes.
Q Cover to cover?
A Yes.
Q And then, did you sign the receipt and send it back to Allied?
A Yes.
Q Isn't it a fact that you are in the habit of reading all documents carefully which you receive?
A Yes.
[5] Did you approach the subject of protecting your goods if they were damaged or lost?
A That was what I stressed all the time in our conversation. "I want all the insurance I can get on these things when I get ready to move."
[6] Let me ask the question. Did you have any discussions with him at the time regarding the evaluation of your goods for insurance to protect you in the event of a loss?
A No.
Q Did you ask him any questions at the time regarding that?
A I finally said, "Now what about insurance?" It had never been discussed. The move had been discussed and the packing had been discussed, how many boxes I would need and how many things were being crated. That sort of thing.
Q What was his response to your question?
A He said, "Yes, we give sixty cents per hundred pounds," I believe is the way they expressed it.
And I said, "That doesn't sound like very much insurance for all the things that I have here that you have seen."
And he said, "Well, we will give you a dollar and a quarter and that is as much as you can get."
And I felt that was it and that I was covered.
Q In other words, he said you couldn't have any more than $1.25 a pound?
A A dollar and a quarter.
Q Did he at that time explain you could place a higher evaluation on your property?
A No, sir.
[7] Now, let me show you Plaintiff's Exhibit 2. Were you ever given the document to sign?
A I must have been given the document, because my signature is on there.
Q On that document is typed the words "One dollar twenty five cents per pound per Order for Service?"
A Uh-huh.
Q Did you type that in there?
A No, sir.
Q Someone other than yourself typed that evaluation on the Bill of Lading?
A Yes, sir.
Q Was that typed in there at the time it was presented for your signature?
A No, sir.
Q I show you Defendants' Exhibit 2, which is a copy of the same document, and ask you if there are any differences between these two documents?
A Well, I don't know, Oh, yes.
Q All right. Just briefly say what the difference is. It is obvious, but please testify.
A One copy has all the items typed in; the other does not.
Q Did you ever see a copy of the document with the items typed in?
A No, sir.