**Edward and Nancy HUGHES, Plaintiffs-Appellants,**

v.

**UNITED VAN LINES, INC., and 291 Sisser Brothers, Inc., Defendants-Appellees.**

**No. 86–2134.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1986.

Decided Sept. 11, 1987.

Stephen T. Mikus, Mark F. Devane, McKenna, Storer, Rowe, White & Farrug, Chicago, Ill., for plaintiffs-appellants.

James W. Tallant, James W. Tallant & Associates, Ltd., Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiffs Edward and Nancy Hughes, brought suit against defendants United Van Lines, Inc. (United) and 291 Sisser

Bros., Inc. (Sisser Inc.) to recover the full value of their household goods destroyed by fire while in transit in United's van between New Medford, New Jersey, and Chicago, Illinois. The district court found United had limited its liability with the plaintiffs to $3.00 per pound pursuant to its contract and awarded plaintiffs $26,180.00 [1] and also denied the plaintiffs' state and common law theories of recovery. Plaintiffs appeal the district court's award contending that (1) the district court erred in holding that the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. 11707, preempted their state and common law theories of recovery; and (2) the district court erroneously found that the defendants properly limited their liability (in this case to $3.00 per pound) under the Carmack Amendment. Thus, the questions on appeal are, whether the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. 11707, preempts state and common law remedies; and second, whether the district court erred in holding that the defendants satisfied the conditions necessary to limit their liability under the Carmack Amendment. We affirm on both issues.

I

In the spring of 1982, after accepting a new position, plaintiff Edward Hughes moved his family from Medford, New Jersey, to Chicago, Illinois. Mrs. Hughes initiated the moving arrangements by contacting Larry Haney, a United Van Lines agent who had organized the Hughes' moves on several previous occasions. Haney in turn made arrangements for Sisser Inc., the local United Van Lines subsidiary moving company in New Jersey, to meet with the Hughes to plan their move. Subsequently, Cy Pavliga, a representative of Sisser Inc., met with Mrs. Hughes to arrange the move of their personal belongings and household goods to Illinois. Pavliga conducted a survey of the Hughes' furniture, clothing and other household and personal items and completed the ICC required Estimated Costs of Service Form. Upon completion of this form, the carrier is required to estimate the weight of the shipment while the shipper must choose the level of liability at which he wishes to insure his goods. Pavliga estimated the weight of the Hughes' shipment at 12,000 pounds and discussed with Mrs. Hughes the various levels of carrier liability insurance available. He stated that he also provided Mrs. Hughes with several Interstate Commerce Commission (ICC) prescribed explanatory pamphlets.[2] The pamphlets included information on how the shipper is to declare a value for his goods and the liability the carrier assumes based on that declared value. The pamphlets also recited warnings to the shipper that he "fully understand the maximum liability of the option [the shipper] desire[s] before signing any documents;" and a recommendation that the shipper not transport family heirlooms or small articles of high value. (Defendants Exhibits 3 and 4). Mrs. Hughes then selected the liability package entitled "*Gold Umbrella Protection-Full Value Guarantee*" based on the weight of the shipment at $3.00 per pound.[3] The $3.00 per pound

1. Because the actual weight of the shipment was 17,060 pounds, United's liability to the Plaintiffs, based on $3.00 per pound, equals $51,180. United had, prior to this action, paid Plaintiffs $25,000. See footnote 5 *infra.* Thus, $51,180, less the $25,000 already paid to Plaintiffs, equals $26,180.

2. The pamphlets are entitled, *Lost or Damaged Household Goods-Public Acvicory No. 4,* and *Summary of Information for Shippers of Household Goods.*

3. The "Gold Umbrella" coverage provided:
"FULL VALUE GUARANTEE
UNITED VAN LINES agrees that if there is a loss of or damage to any item or items which are part of the SHIPPER'S household furniture and/or personal effects while in the care, custody and control of UNITED VAN LINES or any of its representatives, UNITED VAN LINES will make the SHIPPER whole by exercising one of the following options for each of those articles so lost or damaged:
    A. Pay the current market replacement value, without deductions for depreciation;
    B. Pay for full cost of repairs;
    C. Replace with like articles.
The SHIPPER MUST declare the value of his/her household furniture and personal effects being shipped with UNITED VAN LINES at a figure of not less than $3 per pound of actual weight or the actual value, whichever is greater. The cost to the shipper for this Gold

is the lowest valuation available under the "full value protection" package for the household goods. Based on the assumption that the household goods weighed 12,000 pounds, Mrs. Hughes ordered $36,000 worth of coverage at $3.00 per pound. Mrs. Hughes signed and kept a copy of the Estimate for Services form, which provided that United's liability was limited to $36,000.

Subsequent to the meeting with Pavliga, Dave Hendershott, a sales coordinator with Sisser Inc., sent Mrs. Hughes the required ICC Order for Service form with a letter stating:

> "It is necessary to sign in two places and declare a value and return to us in the accompanying envelope. We have shown the desired areas for signing as well as the place for valuation. (We understand that you desire full coverage, minimum $3.00 per pound, which is what you should enter in that area.)"

Mrs. Hughes signed the blanks on the ICC Order for Service form indicating that she had received a summary of the information provided shippers of household goods and declared that the coverage chosen was limited to $3.00 per pound.

In the early morning hours of June 25, 1982, employees of Sisser Inc. completed loading the Hughes' goods in a United moving van. The driver prepared a list of the items loaded which her husband, Ed Hughes, signed. The driver also presented Mr. Hughes with a Uniform Household Goods Bill of Lading and Freight Bill which required the shipper to declare and fill in the blank indicating the valuation rate of the goods shipped and the signature of the shipper. Ed Hughes signed his name in the appropriate space reserved for the shipper's signature, but mistakenly signed his name a second time in the space reserved for the shipper's declared value rate. Thus, because Hughes claims that he mistakenly signed the bill of lading where he was supposed to declare a value for the goods, the Uniform Household Goods Bill of Lading and Freight Bill form failed to expressly state and set forth the shippers' declared value rate for the goods shipped.

Immediately after departing New Jersey, the moving van stopped at a weigh station and recorded the weight of the shipment at 17,060 pounds or 5,060 pounds over the estimate of 12,000 pounds Sisser Inc.'s agent made. While in transit on the Ohio Turnpike, a fire on board the moving van destroyed a substantial portion of the Hughes' shipment. Defendants concede liability for the loss incurred by the Hughes, but challenge the extent (limitation) of their liability.[4]

Umbrella Full Value Guarantee shall be $.75 per $100 of declared value. NOTE: The SHIPPER should declare a realistic value on his/her personal property."
The "Gold Umbrella" plan makes clear that the "full value guarantee" was subject to the shipper's declared value on a per-pound basis. The plan also pointed out that the shipper "should declare a realistic value on his/her personal property." Obviously, coverage of $3.00 per pound on 12,000 pounds of personal property would provide a total coverage of $36,000—far short of the value the Hughes assign to their property destroyed during the move. Thus, the Hughes failed to heed the express warning of the "Gold Umbrella" plan to declare a realistic value on their property. Mrs. Hughes, at her initial meeting with Pavliga, Sisser Inc.'s agent, had tentatively chosen the Gold Umbrella full value protection policy with a maximum replacement value limit of $36,000 ($3.00 per pound, assuming the weight was 12,000 pounds). Following that meeting she called Mr. Haney requesting that he explain the Gold Umbrella "insurance" policy she had tentatively

chosen. According to Mrs. Hughes, Mr. Haney said the coverage was "excellent"; however, she failed to inform Mr. Haney that she had also chosen to limit the full value protection policy to $3.00 per pound. Apparently, relying on Mr. Haney's half-informed recommendation, the Hughes later confirmed their choice of full value protection (i.e., replacement cost protection) with a $3.00 per pound liability limitation by declaring that value on the "Order for Service" form.

4. The defendants initially claimed that the Hughes failed to limit their liability to $3.00 per pound because the bill of lading contained no declared value. Therefore, the defendants argued that the Hughes were entitled to recover for the loss at the rate of $1.25 per pound, the default level of coverage that automatically applies where the parties fail to expressly provide otherwise. On this basis, the defendants paid the Hughes $25,000. On appeal, the defendants do not contest the district court's finding that the Hughes did declare a value for their goods of $3.00 per pound.

On May 21, 1984, the Hughes filed a complaint against the defendants for full replacement cost or $111,848.31 of their personal belongings and household goods damaged or destroyed in the fire. On February 11, 1985, the Hughes amended their complaint to include eight state and common law counts for recovery.[5] The district court determined that the Hughes were entitled to coverage of $51,180.00 ($3.00 per pound x 17,060 lbs.) and entered judgment for the Hughes in that amount, less the $25,000.00 the defendants had already paid, or $26,180.00. In addition, the district court denied plaintiffs' state and common law counts holding that the Carmack Amendment to the Interstate Commerce Act preempted all state and common law theories of recovery. Plaintiffs appeal the district court's holding that their state and common law theories of recovery are preempted by federal law and that their recovery under federal law is limited to $3.00 per pound.

## II. CARMACK AMENDMENT

▋ The plaintiffs initially argue that the Carmack Amendment[6] does not preempt existing state and common law remedies and rely upon 49 U.S.C. § 10103 which provides:

"Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies exist-

ing under another law or at common law."

49 U.S.C. § 10103 (Revised Interstate Commerce Act). A federal law may only preempt state and common laws if it can be established that Congress so intended. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). It is not necessary for a federal statute to provide explicitly that particular state laws are preempted. *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Congress' intent to supersede state law may be evidenced in several ways: preemption may be inferred where Congress has legislated so comprehensively that it has left no room for supplementary state legislation, *Rice v. Santa Fe Elevator Corp., supra*, 331 U.S. at 230, 67 S.Ct. at 1152; further preemption may be inferred where state legislation would impede the very purpose and objectives of Congress as expressed in its legislative enactment. *Hillsborough County v. Automated Medical Laboratories, Inc., supra* 471 U.S. at 713, 105 S.Ct. at 2375.

▋ The United States Supreme Court addressed the preemptive scope of the Carmack Amendment relating to state regulation of carrier liability in *Adams Express Co. v. Croninger*, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913). There, the Court held that:

for the actual loss or injury to the property caused by (1) the receiving carrier (2) the delivering carrier or (3) another carrier over whose line or route the property is transported in the United States ..."
49 U.S.C. § 10730 states in relevant part:
"The Interstate Commerce Commission may require or authorize ... a carrier ... to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by written agreement, when that value would be reasonable under the circumstances surrounding the transportation."
49 U.S.C. § 10103 states:
"Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law."

---

**5.** Hughes' common law counts include: negligence, breach of insurance contract, breach of contract of carriage, conversion, intentional misrepresentation, negligent misrepresentation, and negligent infliction of emotional distress.

**6.** Although the substance of the Carmack Amendment (originally 49 U.S.C. § 20(11)) has been recodified into 49 U.S.C. § 11707, § 10730 and § 10103, these sections are commonly termed the Carmack Amendment.
49 U.S.C. § 11707 states in relevant part:
"A common carrier ... subject to the jurisdiction of the Interstate Commerce Commission ... shall issue a receipt or bill of lading for property in receipt for transportation.... The carrier ... and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission ... are liable to the person entitled to under the receipt or bill of lading. The liability imposed under this paragraph is

"[a]lmost every detail of the subject is covered as completely that there can be no rational doubt that Congress intended to take possession of the subject and supersede all state regulation with reference to it."

*Adams v. Croninger, supra* 226 U.S. at 505, 33 S.Ct. at 152. Although the issue in *Croninger* was whether the states could regulate carrier liability despite the Carmack Amendment, the Court went further and delineated the preemptive scope of the Carmack Amendment as it relates to the availability of state and common law remedies. The Court stated:

"But it has been argued that the non-exclusive character of this regulation is manifested by the proviso of the section, and that state legislation upon the same subject is not superseded, and that the holder of any such bill of lading may resort to any right of action against such a carrier conferred by existing state law. This view is untenable. It would result in the nullification of the regulation of a national subject and operate to maintain the confusion of the diverse regulation which it was the purpose of Congress to put an end to.

What this court said of § 22 of this act of 1906 in the case of *Texas & Pac. Ry. v. Abilene Cotton Mills*, 204 U.S. 426, [27 S.Ct. 350, 51 L.Ed. 553 (1907)], is applicable to this contention. It was claimed that that section continued to force all rights and remedies under the common law or other statutes. But this court said of that contention what must be said of the proviso in § 20, that it was 'evidently only intended to continue in existence such other rights or remedies for the redress of some specific wrong or injury, whether given by the Interstate Commerce Act, or by state statute, or common law, not inconsistent with the rules and regulations prescribed by the provisions of this act.' Again, it was said, of the same clause, in the same case, that it could 'not in reason be construed as continuing in a shipper a common law right the existence of which would be inconsistent with the provisions

of the act. In other words, the act cannot be said to destroy itself.'

To construe this proviso as preserving to the holder of any such bill of lading any right or remedy which he may have had under existing Federal law at the time of his action, gives to it a more rational interpretation than one which would preserve rights and remedies under existing state laws, for the latter view would cause the proviso to destroy the act itself."

*Croninger* at 507–08, 33 S.Ct. at 152. Plaintiffs argue that to the extent that the holding in *Croninger* preempted state and common law remedies in 1913, that holding was overturned with the First Cummins Amendment adopted by Congress in 1915. Plaintiffs point to the provision in the revised 1915 version of the Carmack Amendment to support their argument that Congress intended to preserve for shippers state and common law remedies. That provision stated:

"Provided further, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law."

In rejecting the plaintiffs' argument, we initially note that the remedy provision cited by the plaintiffs in the First Cummins Amendment (incorporated into the Carmack Amendment) and recodified in § 10103 of the revised Interstate Commerce Act is the very provision the Supreme Court considered in *Croninger*. As mentioned earlier, the Court interpreted this provision as meaning that all state and common law remedies, as of that date, inconsistent with the Carmack Amendment, were preempted. In contrast to the plaintiffs' contention that the First Cummins Amendment was an attempt to overrule the holding in *Croninger* regarding the remedy provision, the First Cummins Amendment added nothing to the Carmack Amendment concerning remedies. Rather, the specific additions include (1) expanding the statute's scope to carriage of goods in adjacent foreign countries, (2) specifically providing that the carriers were liable "for the full actual loss, damage or injury" to

property transported (except for property received for transportation where the shipper declares or agrees in writing to a release value for the property), and (3) allowing carriers to require that shippers give them notice of the contents of articles concealed in "wrapping, boxing or other means" in which event the carrier could require the shipper to declare a value thereby limiting carriers' liability. Thus, contrary to the plaintiff's contentions, the First Cummins Amendment addressed issues wholly separate from that of preserving for shippers their state and common law remedies; rather, it addressed the scope of the statute as it applied to the carriage of goods in foreign countries, the scope of the carrier's liability, and notice requirements for "concealed" goods. Furthermore, the Supreme Court has held since *Croninger* that the Carmack Amendment, even with the addition of the First Cummins Amendment, preempts state and common law remedies inconsistent with the federal Act. See *American Railway Express Co. v. Levee*, 263 U.S. 19, 44 S.Ct. 11, 68 L.Ed. 140 (1923) ("The law of the United States cannot be evaded by the forms of local practice ... the limitation of liability was valid, whatever may be the law of the State in cases within its control."). *Galveston, Harrisburg & San Antonio Railway Co. v. Woodbury*, 254 U.S. 357, 41 S.Ct. 114, 65 L.Ed. 301 (1920).

Finally, the majority of circuit courts that have addressed the issue of whether or not state and common law remedies are preempted where goods are damaged or lost in interstate commerce have held that the Carmack Amendment does preempt state and common law remedies based on the *Croninger* decision. See *Air Products & Chemicals, Inc. v. Illinois Central Gulf Railroad Co.*, 721 F.2d 483 (5th Cir.1983) ("... the Carmack Amendment, as judicially interpreted, provides an exclusive remedy for a breach of contract of carriage provided by a bill of lading ..."); *W.D. Lawson & Company v. Penn Central Company*, 456 F.2d 419 (6th Cir.1972) ("As to the [ ] issue ... [of] whether or not the Carmack Amendment preempted common law suits ... we hold that it did"); *R.H.*

*Fulton v. Chicago Rock Island and Pacific Railroad Company*, 481 F.2d 326 (8th Cir.1973) ("The cases make it clear that when damages are sought against a common carrier for failure to properly perform, or for negligent performance of an interstate contract of carriage, the Carmack Amendment governs" quoting *American Synthetic Rubber Corp. v. Louisville & N.R.R. Co.*, 422 F.2d 462, 468 (6th Cir. 1970)); *George R. Hall, Inc. v. Superior Trucking Co.*, 514 F.Supp. 581 (N.D.Ga. 1981) ("Though the Court is impressed by the reasoning in *Litvak* ... seventy-five years of judicial interpretation of the Carmack Amendment have now settled the question of the availability of state remedies against a common carrier ... [u]nder the Carmack Amendment and the judicial decisions interpreting it, plaintiff may only rely on the remedies provided by the bill of lading ...").

Although the Seventh Circuit has not previously addressed this issue, a district court trial judge in *Wirth v. Silvretta*, 575 F.Supp. 1274 (N.D.Ill.1984), held that the Carmack Amendment does indeed bar a shipper from seeking any other remedy either state or common law against a carrier for damages to the shipper's goods that have been transferred in interstate commerce. The trial judge stated:

"Though the court spoke in *Croninger* of the validity of state restrictions on limitation of a carrier's liability, and not squarely on the subject of the continued existence of state common law remedies, we think that the case clearly implies that Congress has shown a purpose to occupy the field of regulating claims for damages to goods shipped interstate. We therefore agree with those courts that have held the Carmack Amendment preempts state common law remedies in the present situation."

*Wirth*, at 1276–77.

The Tenth Circuit, for some reason unknown, stands alone in not agreeing that the Carmack Amendment preempts a shipper from seeking state and common law remedies against a carrier who has damaged or lost the shipper's goods during

interstate transit. See *Reed v. Aaacon Transport, Inc.*, 637 F.2d 1302 (10th Cir. 1981); *Litvak Meat Company v. Baker*, 446 F.2d 329 (10th Cir.1971); *L.E. Whitlock Truck Service, Inc. v. Regal Drilling Co.*, 333 F.2d 488 (10th Cir.1964). Plaintiffs rely on these Tenth Circuit cases to support their position.

In *Litvak*, the court addressed the preemption scope of the Carmack Amendment and concluded that although the amendment preempted any state legislation on the same subject, it did not "oust all other remedial rights of the shipper," *Litvak*, at 335.

The court stated:

"By its very terms the statute did not intend to preempt every cause of action brought by a shipper against a carrier for damage to its interstate shipment.

\* \* \* \* \* \*

[I]ts principal function is to permit a shipper in interstate commerce to bring an action against the initial carrier to recover for damages to the shipment whether such damages occurred while the goods were in the hands of the initial carrier or connecting carrier.

Thus, though the Carmack Amendment allows a shipper to enjoy the elimination of this one element in his burden of proof, it does not compel him to avail himself of the opportunity. The more difficult road of common-law action against a carrier is still open to a shipper wishing to transverse it."

*Litvak*, 446 F.2d at 335–36.

We note that the Tenth Circuit has not yet been confronted, based on our research, with a situation where the carrier had limited its liability to a declared value. In addition, the facts are unclear in these cases as to whether the shipper's choice of the common law remedy was inconsistent with the federal remedy under the Carmack Amendment. We reject the Tenth Circuit's ambig-

uous and unexplained narrow ruling that a shipper may elect a common law remedy inconsistent with the Carmack Amendment. The purpose of this statute is to establish uniform federal guidelines designed in part to remove the uncertainty surrounding a carrier's liability when damage occurs to a shipper's interstate shipment. To permit a shipper to choose among various types of remedies would cause confusion and insurmountable problems and defeat the Act's purpose of eliminating uncertainty as to a carrier's liability by injecting uncertainty back into this area of transportation Congress has sought to regulate.[7]

We reject the plaintiffs' argument and their reliance on the cases of the Tenth Circuit and hold that the remedy provision of the Carmack Amendment preempts all state and common law remedies inconsistent with the Interstate Commerce Act based on our reading of First Cummins Amendment, its legislative history, the Supreme Court decisions, and the majority of circuit court decisions.

### III. LIABILITY LIMITATION

Plaintiffs next contend that even if we hold that the Carmack Amendment preempts state and common law remedies, the defendants, United Van Lines and Sisser Inc., failed to limit their liability under the Carmack Amendment because they failed to comply with the four steps necessary to limit their liability under the Carmack Amendment.

There are four steps a carrier must take to limit its liability under the Carmack Amendment: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. *An-*

---

**7.** If state remedies were available, imagine the scenario of legal problems that an ingenious lawyer could invent. Consider a situation where a carrier of goods collides with another vehicle at a state border causing damages to the goods, then skids across the state line, is struck by another vehicle and a fire ensues destroying most of the goods being shipped. Assuming each state has different remedy provisions, which state's statute prevails? In what state was the damage caused to establish liability?

**1416**

ton v. Greyhound Van Lines, Inc., 591 F.2d 103 (1st Cir.1978).

Plaintiffs challenge the findings of the district court that defendants met the latter three of these requirements on the ground that the evidence presented at trial fails to support the findings of the court. Specifically, they challenge the trial court's determination finding that (1) plaintiffs agreed to limit the defendant carrier's liability to $3.00 per pound; (2) that defendants gave them a reasonable opportunity to choose between two or more levels of liability; and (3) that defendants issued them a valid receipt or bill of lading prior to moving.

Our review will necessarily be limited to whether the district court's findings were clearly erroneous since the appellants' challenge of the district court's finding that United complied with the Carmack Amendment requires us to examine the facts underlying the trial court's decision. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed. 66 (1982). A finding is clearly erroneous when although there is evidence to support it, if the reviewing court, after considering the entire record, is left with the definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed. 518 (1985) (quoting from *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). The question for the appellate court under Rule 52(a) is not whether it would have made the same findings as the trial court, but whether based on the evidence presented it is left with a definite and firm conviction that the trial court erred in its judgment. *United States v. United States Gypsum Co., supra, In the Matter of Fox,* 808 F.2d 552 (7th Cir.1986). We consider each of these steps separately.

### A. ICC–APPROVED TARIFF

The district court found, and plaintiffs do not contest, that United Van Lines maintained a tariff that complied with ICC guidelines at the time of the plaintiffs' move, and therefore, we accept the district court's finding that United's tariff was in compliance with ICC guidelines.

### B. SHIPPER'S AGREED CHOICE OF CARRIER LIABILITY

The second step requires that the carrier obtain the shipper's written agreement of his (the shipper's) choice of carrier liability. Plaintiffs argue that the evidence does not support the district court's finding that the Hughes selected and agreed to value or "insure" their goods for $3.00 per pound. They contend the district court ignored both Mr. Hughes' unrebutted testimony that he unknowingly signed the bill of lading in the dark and Mrs. Hughes' unrebutted testimony that she continually requested full value coverage for her goods. Plaintiffs argue the evidence only supports the conclusion that Sisser Inc. misrepresented to them the extent of coverage and misled them into agreeing to "insure" their goods at $3.00 per pound by not fully explaining the liability limitation in the Gold Umbrella full value protection package. We are certainly sympathetic with their plight, but based upon prior case law and its applicability to the fact situation before the court, we are not persuaded that the district court committed an error in ruling on this issue. See *Sunstream Jet Express, Inc. v. International Air Service Co. Ltd.,* 734 F.2d 1258 (7th Cir.1984) ("If the contract imports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parole evidence cannot be admitted to add another term to the agreement,") (citing *Pecora v. Szabo,* 94 Ill.App.3d 57, 63, 49 Ill.Dec. 577, 581–82, 418 N.E.2d 431, 435–36 (1981)).

We are bound by the trial court's finding of fact if upon our review of the entire record the district court's account of the evidence is plausible. The court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be considered clearly erroneous. *Anderson v.*

*City of Bessemer City, N.C.,* 470 U.S. at 574, 105 S.Ct. at 1512.

The standard for determining whether a shipper agreed in writing to limit the carrier's liability was discussed in *Chandler v. Aero Mayflower Transit Co., Inc.,* 374 F.2d 129 (4th Cir.1967). There, the court stated, "Congress no doubt used the words to indicate that a shipper should agree in the same sense that one agrees or assents to enter into a contractual obligation." *Id.* at 135. See also *New York, N.H. & Hartford R. Co. v. Nothnagle,* 346 U.S. 128, 73 S.Ct. 986, 97 L.Ed. 1500 (1953). One who signs a contract in the absence of fraud or deceit cannot avoid it on the grounds that he did not read it or that he took someone else's word as to what it contained. But an agreement signed under the belief that it is an instrument of a different character is void, and the failure to read an instrument is not negligence per se but must be considered in light of all surrounding facts and circumstances. *Chandler, supra* at 136.

■ Based upon the *Chandler* standard, our review is limited to the question of whether the district court's finding that the plaintiffs knew they were signing a contract for the shipment of their goods was clearly erroneous. We hold that the district court's finding that the Hughes were aware that they were signing a contract for the transportation of their goods was not clearly erroneous.

Evidence was introduced which supports an inference that Mr. Hughes knew he was signing a contract, and was not misled into signing the contract. The record shows that Mr. Hughes was a college-educated, well-traveled businessman. He had shipped his belongings and household goods and items in eleven prior moves, the last three with the defendant United Van Lines or one of its agents. Although this was the first time he had paid for a move himself, Hughes was not completely "in the dark" as to bills of lading. In fact, he does not deny that (1) he was aware that the cost of the move was based on weight and mileage (T. 216); (2) that he could declare a value for his goods (T. 216, 225); and (3) that payment was due after the goods were

delivered (T. 200). In addition, Mr. Hughes testified that the papers he signed "were all together, like a contract ..." and that although he could not read the documents because it was too dark, he could see what was on each sheet and distinguish between the different inventory items (T. 223). The evidence also established that Mr. Hughes was not misled into signing the bill of lading. Mr. Hughes stated and admitted that he hurriedly signed the inventory sheets and bill of lading because "everybody was tired and everybody wanted to get on their way"; (T. 188) and readily admits that he did not read the documents thoroughly. (T. 220–21) Based on this evidence, the district court record supports the trial judge's finding that Mr. Hughes knew he was signing a contract for the shipment of his goods, and was not misled into signing the same.

Plaintiffs argue that based on the standard set forth in *Chandler,* the trial court's verdict is not supported by the evidence introduced at trial. We disagree. This case is distinguishable from both *Chandler* and those cases in which the shipper has proven no agreement was made pursuant to the *Chandler* standard. In *Chandler,* the shipper did not sign a bill of lading at the time of the shipment of the goods and further was fraudulently misled by the carrier's agent who told him he was resigning the inventory sheets when in fact he was signing the bill of lading. In addition, the agent compounded the problem by admitting that he had earlier misinformed and misled the shipper into believing that he was fully protected for any kind of loss. Finally, the carrier admitted that he never issued the bill of lading or a copy of it to the shipper. Thus, *Chandler* is clearly distinguishable from this case.

In contrast to the Hughes, the shipper in *Fireman's Fund Insurance Co. v. Barnes Electric, Inc.,* 540 F.Supp. 640 (N.D.Ind. 1982), the shipper had a very limited understanding of the English language, and although the agent was aware of both the language limitation and the valuable nature of the goods being transported, the agent filled out the air bill (bill of lading) himself

without advising and explaining to the shipper the different types of liability coverage available to the shipper. In addition, the shipper testified that the agent filled out what he understood to be a "questionnaire," and that he was unaware that he had signed a contract.

There is testimony in the record upon which the district court could very well have concluded that Mrs. Hughes was not misled into choosing a $3.00 per pound liability limitation. Mr. Pavliga, Sisser Inc.'s agent, testified that he had in fact explained each level of liability coverage available to Mrs. Hughes and that he made only a recommendation as to what level of coverage to choose. He also testified that he gave Mrs. Hughes several ICC required pamphlets which explain to shippers the types of valuation ("insurance") available and the extent of coverage for each level. Furthermore, Mrs. Hughes admits she called Larry Haney after discussing the $3.00 per pound full value package with a Sisser Inc. agent and relied upon Haney's recommendation to purchase the Gold Umbrella full value package without discussing with him the extent of her coverage. (See footnote 3, *supra.*) Based on the entire record, the district court's finding that the plaintiffs were not misled into agreeing to limit defendant's liability to $3.00 per pound was not clearly erroneous.

Plaintiffs, as a back-up position, offer an alternative theory for challenging the district court's finding that they agreed to insure their goods for $3.00 per pound rather than, as they contend, insure for the full $111,848.31. They argue that because Mrs. Hughes was unilaterally mistaken about the terms of the contract, there was no agreement, and therefore there is no contract because of lack of mutual understanding of terms and the contract is therefore void. Plaintiffs raise this argument in response to the district court's holding which stated in relevant part:

"It may be that Mrs. Hughes misunderstood her conversation with Mr. Pavliga. She may have incorrectly perceived that she was obtaining full value coverage for her household goods which would be paid to her in the event of loss and that such

full value coverage was available in return for a premium payment of $3.00 per pound. However, a unilateral mistake by Mrs. Hughes as to the amount of her coverage is not a valid basis to vitiate a liability limitation. *Cf. Feinberg v. Railway Express Agency,* 163 F.2d 998 (7th Cir.1947), *cert. denied,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948)."

To challenge this, plaintiffs rely on *Gamewell Mfg. Inc. v. HVAC Supply, Inc.,* 715 F.2d 112 (4th Cir.1983), where the appellate court held that a unilateral mistake may void a contract in limited circumstances pursuant to the *Restatement (Second) of Contracts* § 153(a) (1981). The rule states:

"Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if [he does not bear the risk under § 154 and] . . .

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake."

■ We reject the plaintiffs' novel and self-serving argument. The law with regard to voiding the effect of a signature on an ambiguous contract due to unilateral mistake is clear. In the absence of fraud, the consent evidenced by a signature may be voided only if two requirements are met. They are (1) the shipper did not know at the time he signed the papers that they were in fact contractual documents; and (2) shipper's failure to read the document and ascertain their true nature was excusable under all of the circumstances (i.e., the shipper acted as a person of ordinary prudence would have acted in the circumstances). *Chandler, supra* at 136–37.

■ Similarly, once the shipper was aware that the document signed was a contract for transporting his goods, absent fraud or bad faith, the shipper cannot re-

form the bill of lading without the consent of the carrier on the grounds that they were unilaterally mistaken about the terms of the contract. See *Hopper Furs, Inc. v. Emery Air Freight Corp.*, 749 F.2d 1261 (8th Cir.1984) ("[shipper's] mistake was unilateral and therefore may not be the basis for reformation of the contract [without the carrier's approval].""); *Thomas v. Transworld Airlines, Inc.*, 457 F.2d 1053 (3rd Cir.1972) ("[W]hen no question of fraud, bad faith or inequitable conduct is involved and the right to reform an instrument is based solely on mistake, it is necessary that the mistake be mutual.... Mere failure to read an instrument, thus giving rise to plaintiff's unilateral mistake, is insufficient to obtain relief.")

As we stated earlier, we hold that there is more than sufficient evidence to support the trial court's finding that the plaintiffs knew at the time of signing the document that they were signing a contract for transportation of their goods. The "Order for Service" form Mrs. Hughes signed was a formal document which included the estimated cost, notice to the shipper to declare a value for the goods, two places for the shipper's signature, and a host of information regarding the move. Mrs. Hughes also testified that she did not read the Full Value Guarantee information provided with the Order for Service form. (T. 133, 151).

Likewise, taking Ed Hughes' (an experienced mover) testimony at face value that he was not aware that he was signing a contract when he signed the inventory sheets and the bill of lading prior to shipment, it was his fault for not reading the bill of lading. A reasonable, prudent person in those circumstances, particularly one as experienced as Mr. Hughes, and one with a college education, would have have taken the time to read and understand the bill of lading in its entirety.

Plaintiffs rely on the Restatement of Contracts (Second) § 153 and the application of that section in *Gamewell Manufacturing, Inc. v. HVAC Supply, Inc.*, 715 F.2d 112 (4th Cir.1983), to support their position that no contract existed because of the Hughes' unilateral mistake. The Re-

statement section simply is not appropriate in this situation because its application has been limited to circumstances where a party settles a cause of action based on a unilateral mistake. *Gamewell* involved a patent infringement action where one party attempted to rescind a settlement agreement after mistakenly relying on false information about their product. The court limited its discussion to cases where one party sought to rescind a settlement agreement. Thus, this principal has been narrowly applied only to cases involving settlement agreements. In addition, plaintiffs are unable to cite any language in the cases where the court has even considered adopting this rule of unilateral mistake in contract for carriage cases.

Based on the well established law in contract for carriage cases and the very narrow application of the unilateral mistake principal to cases involving settlement agreements, we reject the plaintiffs' argument that the signature on the bill of lading may be voided if the signing party was unilaterally mistaken about the terms of the contract, and we hold that the defendants satisfied the second requirement under the Carmack Amendment by agreeing in writing with the plaintiffs to limit their liability to $3.00 per pound.

## C. SHIPPER'S FAIR OPPORTUNITY TO CHOOSE THE CARRIER'S LIABILITY

The third step a carrier must take to limit its liability under the Carmack Amendment requires that a shipper be given a fair opportunity to choose between a higher liability level and a lower liability level. A fair opportunity means that the shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice. *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir.1978), *Quasar Company v. Atchison, Topeka and Santa Fe Railway Company*, 632 F.Supp. 1106 (N.D.Ill. 1986). In addition, any limitation of liability must be brought to the attention of the shipper before the contract is signed, and

the shipper must be given a choice to contract, with or without, the limitation of liability in the movement of his goods. *Chandler v. Aero Mayflower Transit Co., supra,* at 137.

The district court rejected the plaintiffs' argument that they were not given a reasonable and fair opportunity to exercise their right to choose between alternative levels of coverage. The court stated:

> "[The evidence shows that United's] instructions to Mrs. Hughes (to fill in the $3.00 per pound liability limitation on the Order for Service Form) was based on Mrs. Hughes' conversation with [the United Agent]. Mrs. Hughes, not [United], selected the liability limitation which governed the contract between parties."

Plaintiffs argue that the evidence does not support the district court's finding because they allege that the trial court ignored the testimony of the Hughes that they were misled into signing a contract that limited their coverage to $3.00 per pound on lost and damaged goods. We disagree since the determination of whether the Hughes were given a fair opportunity to choose between different levels of liability is a question of witness credibility, and it cannot be said the trial court erred in giving more weight to the testimony of the defendants' witness than to the testimony of the plaintiffs. Once again, we emphasize that the standard of review on appeal under Rule 52 is very narrow. When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor including but not limited to the actions, mannerisms, and facial expressions that bear so heavily on the listener's understanding of and belief in what is said. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses,

each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. *Anderson v. City of Bessemer City, N.C., supra* 105 S.Ct. at 1513.

Applying this standard, we conclude that based on a review of the entire record, the trial court could very well have found that the Hughes were intelligent and experienced movers, received adequate information from both Mr. Pavliga and the informational pamphlets about the extent of coverage available and the specific terms of each type of coverage. Plaintiffs rely on *Allied Van Lines, Inc. v. McKnab,* 351 So.2d 344 (Fla.1977), to support their position that Mrs. Hughes was not given a fair opportunity to choose between the higher and lower levels of liability. They argue that, like the shippers in *McKnab,* the fact that the carrier (United) filled in the value on the bill of lading rather than the shipper is evidence that the carrier had misled them about the extent of their liability coverage.[8] But in *McKnab,* the trial court found that the shipper had in fact been misled by the carrier agent as to the available coverage and was prevented from choosing adequate coverage. In contrast, the district court here found that Mrs. Hughes was not misled about the types of liability coverage available to them. The district court quite emphatically stated that, "the evidence in this case is devoid of any fact or inference to suggest that United attempted in any way to mislead plaintiffs." Unlike the circumstances in *McKnab,* the plaintiffs here, were given several opportunities to familiarize themselves with the nature of their coverage and *seek an explanation if they had any questions.* Instead, the plaintiffs allegedly relied upon Mr. Haney's explanation of the coverage without completely informing him of the type of full value coverage they had chosen. Thus, based on the entire record which establishes that the Hughes (1) discussed the different types of liability cover-

---

8. The record indicated that on a copy of the bill of lading United had inserted the previously agreed upon declared value of $3.00 per pound.

age with Mr. Pavliga; (2) chose the Gold Umbrella full value protection with a replacement value limitation of $3.00 per pound; (3) were given informational pamphlets explaining the liability limitations associated with the different rates a shipper could declare for his goods; (4) had opportunities to call Sisser, Inc. about any misunderstanding they had about their liability coverage; (5) signed the "Order for Service" form voluntarily declaring the valuation rate to be $3.00 per pound; and (6) were seasoned shippers of goods (11 times), we hold the district court's finding that the plaintiffs were given a fair opportunity to choose between alternative levels of coverage was not clearly erroneous.

## D. PROVIDING THE SHIPPER WITH A BILL OF LADING

■ The fourth step a carrier must take in order to limit its liability under the Carmack Amendment is to provide the shipper with a receipt or bill of lading before transporting his goods. Although plaintiffs acknowledge receiving a receipt or bill of lading, they argue the bill of lading is void because it did not comply with federal regulations. Plaintiffs argue the bill of lading is defective in three ways. First, the bill of lading had no release value written on it as required by 49 C.F.R. § 1056.-6(a) and § 1056.6(b)(11); second, the carrier, rather than the shipper, typed in its claimed liability limitation in violation of 49 C.F.R. § 1307.201(c); and third, the limiting language in the bill of lading was neither distinctively colored nor in bold face type as required by 49 C.F.R. § 1307.201(c).

Plaintiffs initially argue that because the only figure written on the bill of lading was an ambiguous reference to "Full Value Guarantee" any liability limitation is void pursuant to 49 C.F.R. § 1056.6(a) and § 1056.6(b)(11). Plaintiffs obviously ignore the fact that the absence of a declared value on the bill of lading is the result of Mr. Hughes' failure to insert the value of their goods. Instead of inserting in the space provided the $3.00 per pound value, Mr. Hughes mistakenly signed his name there. There was nothing ambiguous about the bill of lading since it provided two distinct printed warnings to the experienced shipper instructing him where to declare the value of his goods and the consequences of his or her failure to properly insert the amount of coverage desired in the space provided would result in limiting the carrier's liability to $1.25 per pound. Although it was early morning when Mr. Hughes signed the bill of lading, he admitted his carelessness in that he made no attempt to read the provision of the contract, and that he was tired and everybody wanted to get on with the move. We know of no case law nor has any been provided to us holding that United has an obligation to ensure that the shipper reads the bill of lading carefully. It was Mr. Hughes' responsibility, an experienced mover, to read the bill of lading carefully, and question anything he did not understand. His careless and negligent failure to do so, however, is not grounds for voiding the limitation.

Plaintiffs next argue that the bill of lading is invalid because the carrier, rather than the shipper, typed in its claimed liability limitation on the bill of lading in violation of 49 C.F.R. § 1307.201(c). They cite *Brannon v. Smith Dray Line & Storage Co., Inc.*, 456 F.2d 260 (6th Cir.1972), to support their argument. The regulation states that:

(c) *Statement on bills of lading.* The bill of lading ... shall have printed ... a statement reading as follows:

NOTICE: The shipper signing this contract must insert in the space above, in his own handwriting, either his declaration of the actual value of the shipment....

49 C.F.R. § 1307.201(c).

The purpose of requiring that the shipper, rather than the carrier, fill in the declared value of the goods is to assure that the shipper makes a deliberate and well-informed choice to the valuation of their goods. In *Brannon*, unlike this case, the district court found the shipper was not given a fair opportunity to make such choice. There, the district court made findings of fact that the shipper had not been

given a copy of the written cost estimate before or after she signed the contract, nor was she given a copy of the *Notice to Shippers of Household Goods* as required by the Interstate Commerce Commission to be furnished to all prospective shippers of household goods in interstate commerce. Also, the carrier's agent did not adequately advise the shipper concerning her opportunity to choose a range of valuation while assuring her that the rate he suggested would afford her sufficient coverage. It was based on these findings that the court of appeals stated:

> "In light of these findings, together with the fact that the carrier had typed in the valuation figure on the bill of lading rather than allowing the shipper to write that figure herself as provided in the printed instructions for completion of the document, the court held that the shipper was not bound by this valuation...."

*Brannon* at 261. Thus, the significance of the fact that in *Brannon* the carrier, rather than the shipper, typed in the valuation figure on the bill of lading is dependant upon the surrounding circumstances and only significant when the shipper is not adequately advised concerning the shipper's opportunity to declare a value for his or her goods. In this case, unlike *Brannon*, it is not very significant. Since, as the district court found, the defendants clearly informed Mrs. Hughes of the alternative levels of liability based on her meeting with Mr. Pavliga and the ICC informational pamphlets she received from the defendants. In addition, the district court found, and we agree based on our review of the record, that Mrs. Hughes made a deliberate and well-informed choice to limit coverage to the $3.00 per pound level of coverage after her meeting and conversation with Mr. Pavliga. She then declared the value, in writing, on the Order for Service Form after the Hughes had an opportunity to read the informational pamphlets and discuss the coverage with a United agent. Instead, Mrs. Hughes states that she apparently mistakenly relied upon Mr. Haney's half-informed recommendation that they contract for the "Full Value Guarantee" package (see footnote 3, *supra*). Based on the fact that the Hughes (1) discussed the different types of liability coverage with Mr. Pavliga; (2) chose the Gold Umbrella full value protection with a replacement value limitation of $3.00 per pound; (3) were given informational pamphlets explaining the liability limitations associated with the different rates a shipper could declare for his goods; (4) had opportunities to call Sisser, Inc. about any misunderstanding they had about their liability coverage; (5) signed the "Order for Service" form voluntarily declaring the valuation rate to be $3.00 per pound; and (6) were seasoned shippers of goods (11 times), the Hughes' argument that the shipper's inclusion of the $3.00 per pound liability rate on the bill of lading evidences its intent to mislead the Hughes about the extent of their coverage is simply not valid. United filled in the $3.00 per pound liability rate on the bill of lading after the Hughes had clearly chosen that value and was merely confirming what the plaintiffs had earlier decided.

Plaintiffs', grasping one last straw, argue that United failed to strictly comply with its tariff instructions and federal regulations because the limiting language in its bill of lading was neither distinctively colored nor in boldface type is unpersuasive. 49 C.F.R. § 1307.201(c) states in relevant part:

> "(c) *Statement on bills of lading.* The bill of lading issued for any accepted for transportation ... shall have printed in distinctive color in boldface type on the face thereof...."

49 C.F.R. § 1307.201(c). Once again, plaintiffs' argument that the bill of lading is void because the warnings were not sufficiently distinct on the face of the contract is too formalistic. The limiting language in the bill of lading was sufficiently distinct in color and type. It gave two warnings to the plaintiffs that they must insert their declaration of the actual value of the shipment. The bill of lading sufficiently informed plaintiffs of their duty to complete the instrument, and warned them of the consequences if they failed to declare a release value.

Plaintiffs cite *Caspe v. Aaacon Auto Transport, Inc.,* 658 F.2d 613 (8th Cir. 1981), to support their position that failure to strictly comply with the tariff and federal regulations voids any liability limitation in the bill of lading. In *Caspe,* although the trial court held that the carrier's failure to fully comply with its tariff and ICC order made void the limitation clause in the bill of lading, the court of appeal's real concern focused on the carrier's failure to inform the shipper of the limitation clause. The circuit court of appeals stated:

"It seems obvious that the purpose of putting a limitation clause in bold-face type is to make it stand out and attract the reader's attention. It seems equally obvious that putting the entire agreement in densely packed bold-face type, such as Aaacon did, with the limitation clause buried in the middle of the agreement, does not achieve that purpose. Additionally, Aaacon's agreement provided no space for shipper to declare the value of the property, as is contemplated by the tariff and order, and which would be a further means of attracting the shipper's attention by causing him to focus on the value of the shipment."

In this case, defendants orally and in writing informed plaintiffs of the limitation provisions in the contract, and gave them ample opportunity to review, question, understand and, if need be, question the consequences of the liability limitations if they were not satisfied with Mr. Pavliga's explanation. Defendants supplied Hughes with information about the Full Value Guarantee package (Defendants' Ex. 11), ICC required informational pamphlets (Defendants' Ex. 3 and 4) which explains to the shipper the procedures and consequences of declaring a value for the shipper's goods; and a bill of lading which contained distinctly colored warnings in bold-face type about declaring a value for the goods shipped. Despite the fact that they are experienced movers whose three previous moves were with United, the plaintiffs failed to read all the documents United provided to them.

This same concern of strict compliance with tariff and ICC regulations was recently addressed in *Robinson v. Ralph G. Smith, Inc.,* 735 F.2d 186 (6th Cir.1984) where the court of appeals held that substantial compliance with the ICC tariff requirements in a carrier's bill of lading form was sufficient to limit a carrier's liability. In reviewing the bill of lading the court stated:

"The language in the limitation clauses of both the tariff and the bill of lading is similar and conveys the same meaning. Furthermore, the limitation clause of the bill of lading is eyecatching in that it is set out in a separate paragraph and all in capital letters, enhancing the probability that it will be seen by the shipper, and ample space is provided for the shipper to write his own estimate of the value of the animal to be shipped."

*Robinson,* at 190. The rationale for that decision was that the purpose of the regulation was to encourage competition by allowing shippers to choose for themselves the amounts of "insurance" they wish to cover a shipped article, and to reduce unnecessary federal regulation. Based on this policy, the court stated, "This legislation will best be served by the adoption of a substantial compliance rule." *Robinson, Id.*

Although we need not determine whether to adopt a substantial compliance rule in this instance, based on the existing case law and our review of the facts in this case, we reject the plaintiffs' argument that United's liability limitation is void because the bill of lading fails to strictly comply with United's tariff and ICC regulations because defendants did inform Hughes on several occasions of the nature of the liability limitations, thus satisfying the purpose for the distinct warnings on the bill of lading. We hold that defendants' bill of lading complied with federal regulations by distinctly highlighting the warnings and providing the Hughes with a fair and reasonable opportunity to declare a value for their goods on the bill of lading. The plaintiffs were provided a valid bill of lading prior to transporting their goods, and therefore United successfully limited

its liability under the Carmack Amendment to $3.00 per pound.

## IV

In summary, we hold that the district court's action was proper in holding that the proper interpretation of the Carmack Amendment to the Interstate Commerce Act (recodified 49 U.S.C. § 11707, § 10730, and § 10103) preempts all state and common law remedies inconsistent with the Interstate Commerce Act. We also hold that the district court's finding that defendants satisfied all four requirements needed to limit their liability under the bill of lading was not clearly erroneous, and thus the district court's decision to award plaintiffs $26,180 while denying all other claims. Affirmed.